**Jose Elias GAONA, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–86–221–CR.**

Court of Appeals of Texas,
Corpus Christi.

June 4, 1987.

Rehearing Denied June 30, 1987.

Abel Tosacno, Jr., Harlingen, Joseph A. Connors, III, McAllen, for appellant.

Ben Euresti, Jr., Brownsville, for appellee.

Before NYE, C.J., and KENNEDY and SEERDEN, JJ.

## OPINION

NYE, Chief Justice.

Appellant appeals his conviction for the offense of involuntary manslaughter, for which he was assessed eight years' imprisonment. He brings nine points of error regarding the sufficiency of the evidence, the trial court's refusal to charge the jury on accident and involuntary conduct, and jury misconduct. We affirm.

By his eighth point of error, appellant attacks the sufficiency of the evidence to support the conviction. The State's evidence of guilt reflects the following. Appellant and the victim, Jose Luis Rodulfo, were long-time neighbors and friends. They both attended the same high school, and both lived on Barcelona Street in Harlingen, Texas. Rosalinda Sanchez, who lived on the south side of Barcelona, testified that, on September 14, 1985, she went to bed about 11:00 p.m.. She heard a noise and got up and looked out her front bedroom window. She saw the victim and appellant wrestling in the street in front of her home. Her son, Flavio Sanchez, was outside, with the other two boys, sitting on the curb in front of the Sanchez' home playing his guitar. She testified there was a street light nearby and several porch lights were on which provided enough light to enable her to see what was happening. She was not particularly alarmed so she went back to bed. About fifteen minutes later she was awakened by a loud gunshot. She got up and looked through her window and saw a body lying in the street and appellant "with a weapon in his hand going toward his house." She said the weapon was a rifle. She watched appellant go inside his home, and then she phoned the police.

Flavio Sanchez had grown up with both appellant and the victim. He testified that earlier in the evening he had been playing his guitar by a nearby canal. He came back home and resumed playing the guitar in his front yard. Appellant and the victim were already wrestling in the street when he arrived. He watched them wrestle for over an hour and was not concerned. He considered their activity normal horseplay.

Flavio testified that they began "wrestling rather rough," and that he told the victim, "cool it, Ozzy [the victim's nickname]." He said, "They started wrestling hard." Several friends drove by in a car and appellant and the victim stopped and talked with them. After the friends left, appellant and the victim resumed pushing each other and arguing. Flavio stated that they looked liked they were going to wrestle again, but then the victim sat down in the street and appellant went inside his home. Appellant was inside for twenty or thirty seconds before he came out of his house with a rifle.

■ Flavio testified that appellant came outside his front gate and stood on a grassy area between his front fence and the curb, which was about fifty feet from where the victim was sitting in the street. Flavio's specific testimony regarding the shooting was as follows:

A: He stopped; he put his hands, he just goes like that.[1]

\* \* \* \* \* \*

---

**1.** We pause to note, that descriptions such as "like that" or "like this" may have a significant

A: He came out of the front gate, which is this small one, walked like that and pointed like that.

\* \* \* \* \* \*

Q: In which direction did he point?

\* \* \* \* \* \*

A: Where Jose Luis was sitting.

\* \* \* \* \* \*

A: He just picked it up like that in one hand and fired. I saw smoke come out and I saw Jose Luis Rudolpho just went back.

\* \* \* \* \* \*

Q: And so then when the defendant pointed the weapon, did he raise it to his arms like this?

A: No, he did not.

Q: You are saying that when he raised it, he had it down to his side?

A: Yes.

Q: And raised it from about hip level?

A: Yes, sir.

Flavio Sanchez testified that, after the shooting, appellant went back to his house and closed the door "like nothing had ever happened." Appellant stayed in his house "a little while," then came out and "tried to wake him up. He was slapping him telling him to wake up, to get up."

Flavio said he saw blood near the victim's head and he ran into his house and told his mother: " 'He really shot him.' I thought it was a prank." He said he was surprised when appellant came out with a gun, but did not think appellant was going to shoot. He also testified that he had seen appellant with a rifle before on several occasions. He said that appellant went "to the canal hunting a lot [sic]."

Officer Neely testified that, when he arrived on the scene and asked the people standing in the area where the person was who had done the shooting, he was directed to appellant's residence. As Neely walked toward appellant's residence, appellant approached him and Neely asked appellant what had happened. Appellant responded, "I shot him. He's not dead, is he"? Neely asked where the gun was, and appellant responded, "it's in my house," and then replied that it was a .22 rifle. A search of appellant's residence revealed a .22 caliber rifle laying on appellant's bed along with some bullets. A spent .22 caliber shell was found in the gutter of appellant's driveway. There was also testimony that a rifle is a firearm. A pathologist testified the victim died of a gunshot wound to the head.

Detective Gray interrogated appellant at the police station. On cross-examination, the defense elicited testimony regarding the statements appellant made to him. Gray admitted that appellant told him that appellant had tried to make the victim stop pushing him but the victim persisted. Gray testified appellant told him that after he had "gained possession of the weapon" that "he had taken it outside . . . he had pointed it at the ground told Mr. Rudolfo to just be cool and he pulled the trigger." Gray further testified that appellant had told him, "I got my father's .22 and went back outside and I shot the gun at the ground."

When reviewing the sufficiency of the evidence to support the conviction, we view the evidence in the light most favorable to the verdict to determine if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Gardner v. State,* 699 S.W.2d 831, 836 (Tex.Crim.App.1985); *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App. 1984).

■■■ A person commits the offense of involuntary manslaughter if he recklessly causes the death of another individual. *Keith v. State,* 692 S.W.2d 921, 923 (Tex. App.—Houston [14th Dist.] 1985), *pet. ref'd,* 721 S.W.2d 294 (Tex.Crim.App.1986); Tex.Penal Code Ann. § 19.05(a)(1) (Vernon 1974). A person acts "recklessly" when he

impact on the jury's consideration of the mental state accompanying a particular act. When these descriptions appear in an appellate record without further explanation, we can presume that the undescribed act supports the jury's findings. Appellant has the burden of providing a sufficient record for appellate review if he wishes to complain of matters which are affected by testimonial descriptions.

is aware of, but consciously disregards, a substantial and unjustifiable risk. *Keith*, 692 S.W.2d at 923; Tex.Penal Code Ann. § 6.03(c) (Vernon 1974). The specific intent to kill is not an element of involuntary manslaughter. *Yates v. State*, 624 S.W.2d 816, 817 (Tex.App.—Houston [14th Dist.] 1981, no pet.).

■ Here, there is evidence that appellant left the street and went into his residence and obtained a loaded rifle, came out and pointed the rifle in the general direction of the victim, and then pulled the trigger. There is also evidence that appellant was familiar with rifles and frequently hunted with the rifle involved. The Court of Criminal Appeals noted, in *Thomas v. State*, 699 S.W.2d 845, 850 (Tex.Crim.App. 1985) (reviewing the question of whether a charge on criminally negligent homicide should have been given), that evidence that a defendant knew a gun was loaded, was familiar with guns and their potential for injury, and pointed a gun at another tends to indicate that person was aware of a risk created by that conduct and disregarded the risk.

Appellant argues the evidence is insufficient to show recklessness, but instead shows accidental discharge, and, therefore, only supports the offense of criminally negligent homicide. The jury in this case was charged on murder, involuntary manslaughter and criminally negligent homicide. Considering all the facts and circumstances surrounding the shooting, we find the evidence was sufficient to support the jury's finding that appellant was aware of the risk created by his conduct. *See generally Yates v. State*, 624 S.W.2d 816 (Tex. App.1981); *see also Mendez v. State*, 575 S.W.2d 36 (Tex.Crim.App.1979); *cf. Keith v. State*, 692 S.W.2d 921 (Tex.App.1985). Point of error eight is overruled.

At the charge conference in the guilt/innocence phase, appellant requested an affirmative charge on the absence of voluntary conduct pursuant to Tex.Penal Code Ann. 6.01(a) (Vernon Supp.1987). Specifically, appellant requested that the jury be instructed:

[A] person commits an offense only if he voluntarily engages in conduct, including an act, omission or possession. Conduct is not rendered involuntary merely because the person did not intend the results of this conduct. Therefore, if you believe from the evidence beyond a reasonable doubt that on the occasion in question the defendant, Jose Elias Gaona, Jr., did cause the death of Jose Luis Rodulfo by shooting him with a gun as alleged in the indictment but you further believe from the evidence and have a reasonable doubt thereof, that the shooting or the discharge of the weapon was a result of an accidental discharge ... of the weapon, while the defendant, Jose Elias Gaona, Jr., was standing on terrain causing him ... to loose [sic] his balance, and thereby, probably or possibly contributing to the accident which resulted in the discharge of the weapon, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty.

The trial court refused to submit the instruction. Appellant now challenges the trial court's ruling in his first five points of error.

■ A defendant is entitled to an affirmative instruction on every defensive issue raised by the evidence, regardless of the origin, weight or sufficiency of that evidence. *Booth v. State*, 679 S.W.2d 498, 500 (Tex.Crim.App.1984). A defendant's testimony alone may be sufficient to require a charge on a defensive issue. *Warren v. State*, 565 S.W.2d 931, 934 (Tex.Crim.App. 1978).

■ There is no defense of accident under the present penal code. *George v. State*, 681 S.W.2d 43, 45 (Tex.Crim.App. 1984); *Williams v. State*, 630 S.W.2d 640, 644 (Tex.Crim.App.1982). However, Section 6.01(a) provides that a person commits an offense only if he *voluntarily* engages in conduct. Thus, if raised by the evidence, a jury may be charged that an accused should be acquitted if there is a reasonable doubt as to whether he voluntarily engaged in the conduct of which he is charged. *George*, 681 S.W.2d at 45; *Williams*, 630

S.W.2d at 644. The Court of Criminal Appeals held in *George v. State*, that "one voluntarily engages in conduct when the conduct *includes, inter alia,* a voluntary act and its accompanying mental state, if any." 681 S.W.2d at 45. The conduct is not rendered involuntary because it includes an involuntary act or because the accused did not intend the result of his conduct. *Id.*

Appellant testified that on the night in question he and the victim began to horseplay and wrestle with each other; that the victim accidently "busted" his lip during the scuffle and became angry. According to appellant, the victim threatened to bust appellant's lip and began coming at appellant. Appellant testified that he was tired and wanted the victim to stop, but he persisted. Appellant stated that he decided to stop the victim by scaring him, so he went inside his house and considered getting a BB gun, but decided it would not scare the victim. Instead, he obtained a .22 rifle.

Appellant testified that he did not realize the risk involved because he was not thinking. He did not intend to do anything but scare the victim. He said he "must have loaded it when I was in my room to where to gate is...." He also stated that he used a clip to load the gun. He said he came back outside and stood between the curb and the front fence, and that he had his "hand on the trigger." He testified that he did not point the gun at the victim, but pointed it at the ground. He said he did not intend to shoot or pull the trigger. He stated, "all I remember is I had the gun like that and I was looking at him and it just went off ... I had my finger on the gun. It just went off."

When the rifle went off, appellant said he thought the victim was playing-acting, so he paid no attention to him and went back inside his house to put the gun up. Then he said he heard Flavio cry out that appellant had shot Ozzy. Until that time, appellant testified that he had no idea that the victim had been shot. When asked by defense counsel if he had slipped, appellant replied, "I must have slipped or something...." Appellant also stated, "I was just walking up there and then before I stopped, it just went off...."

Appellant acknowledged that he went inside his house to get a gun and confront the victim, that he loaded it, and that he had his finger on the trigger. He denied pointing the gun at the victim or pulling the trigger. The question is whether appellant's testimony, "[i]t just went off ... I must have slipped or something" raises the issue of whether appellant voluntarily engaged in the conduct with which he was charged.

The facts of this case are similar to those in *George*. There, the defendant pulled a loaded pistol from his pocket and pointed it at his friend's face. The defendant thumbed the gun's hammer partially back and the gun discharged. The defendant testified that "the hammer slipped off my thumb" and the gun "went off." He claimed the shooting was an accident. The Court noted that the defendant voluntarily engaged in conduct up to that very second when the hammer slipped off his finger and the gun went off. Under the facts, the Court reasoned, whether the precise body movement which released the hammer was voluntary or not was unimportant. The Court stated:

> Where the issue is whether an accused recklessly caused [the result of the conduct] by shooting with a gun and the evidence shows that the accused voluntarily engaged in conduct that includes, *inter alia,* one or more voluntary acts leading to the actual shooting, we hold as a matter of law the fact that when such conduct also includes a bodily movement of the accused sufficient for the gun to discharge a bullet, without more—such as precipitation by another individual ... a jury need not be charged on the matter of whether the accused voluntarily engaged in the conduct with which he is charged.

681 S.W.2d at 47.

It was established in the instant case that the area where appellant stood, between the front fence and the curb, was not level but sloped downward to the street where the victim was sitting. Appellant

testified that he must have slipped because "I wasn't going to stand there and lean like that" and "I wasn't going to go up there and stand like that, because its level."[2]

It is unclear from the testimony whether appellant was aware at the time of the shooting that he was standing on unsure footing or whether he came to this realization in retrospect. Nevertheless, we do not consider this testimony that "I *must have* slipped" to fairly raise the issue of absence of voluntary conduct. This testimony is more in the nature of speculation rather than concrete evidence that an independant precipitating event was the real culprit. *Cf. Garcia v. State*, 605 S.W.2d 565 (Tex. Crim.App.1980); *Whitehead v. State*, 696 S.W.2d 221 (Tex.App.—San Antonio 1985, pet. ref'd). The fact that a weapon "just went off" does not render an act involuntary so as to require a charge. *Pimentel v. State*, 710 S.W.2d 764, 773 (Tex.App.— San Antonio 1986, no pet.).

■ Though appellant denied aiming the rifle at the victim, he engaged in numerous voluntary acts up to the very second when he claims that he "must have slipped" and the rifle "just went off." This evidence just reiterates appellant's claim that he did not intend the results of his conduct. The jury obviously agreed with appellant's assertion.

We hold that the evidence did not raise the issue of involuntary conduct and the trial court did not err in refusing to charge the jury on this issue. *See George*, 681 S.W.2d at 43; *Dockery v. State*, 542 S.W.2d 644 (Tex.Crim.App.1976); *Lewis v. State*, 529 S.W.2d 550 (Tex.Crim.App.1975); *Pimentel*, 710 S.W.2d 764; *Withers v. State*, 631 S.W.2d 595 (Tex.App.—El Paso 1982), *aff'd on other grounds*, 642 S.W.2d 486 (Tex.Crim.App.1982). Appellant's first five points of error are overruled.

By his ninth point of error, appellant argues that his "state and federally guaranteed constitutional rights of due course of law and due process" were denied by the trial court's failure to instruct the jury on

involuntary conduct. Appellant cites the following cases, all involving violations of federal law, to support his proposition: *United States v. Escobar De Bright*, 742 F.2d 1196 (9th Cir.1984); *United States v. Goss*, 650 F.2d 1336 (5th Cir.1981); *United States v. Grissom*, 645 F.2d 461 (5th Cir. 1981); *United States v. Parker*, 566 F.2d 1304 (5th Cir.1978), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978); *United States v. Hammons*, 566 F.2d 1301 (5th Cir.1978), *vacated* and *remanded*, 439 U.S. 810, 99 S.Ct. 68, 58 L.Ed.2d 102 (1978); *Lange v. United States*, 453 F.2d 1332 (9th Cir.1972); and *Griego v. United States*, 298 F.2d 845 (10th Cir.1962).

These cases provide appellant no support in the instant case. They cite the general rule that a defensive instruction must be given if there is any evidentiary foundation whatsoever for a legal defense. We have viewed the evidence in the light most favorable to appellant and determined there is no evidentiary support in the record to require an instruction on involuntary conduct. Point of error nine is overruled.

By his seventh point of error, appellant claims the trial court erred in failing to grant appellant's motion for new trial when it was established that one of the jurors, Pedro Leija, Jr., was not a resident of the county in which the case was tried. At the hearing on appellant's motion for new trial it was shown that Juror Leija had noted on his juror information card that he had lived in Cameron County all during his "lifetime." He had apparently moved his residence just over the county line to Hidalgo County several years previously, but had not changed his voter registration. No inquiry was made of this juror during voir dire regarding his residency qualifications.

Tex.Code Crim.Proc.Ann. art. 35.16(a) (Vernon Supp.1987) provides in relevant part:

"(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable

---

**2.** On cross-examination, appellant admitted he was wearing tennis shoes at the time, and that

he was not sure whether he had slipped.

or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

1. That he is not a qualified voter in this state and county under the Constitution and laws of the state; ...

\* \* \* \* \* \*

No juror shall be impaneled when it appears that he is subject to the second, third or fourth grounds of challenge for cause set forth above, although both parties may consent. *All other grounds for challenge may be waived by the party or parties in whose favor such grounds for challenge exist."* (Emphasis ours). Appellant's challenge for cause comes within the purview of Article 35.16(a)(1); thus, such a challenge may be waived.

■ We hold that appellant waived any error by failing to inquire about the juror's qualifications during voir dire examination and by failing to assert his challenge at that time. *Vaughn v. State*, 113 S.W.2d 895, 896 (Tex.Crim.App.1938); *Matthias v. State*, 695 S.W.2d 736, 740 (Tex.App.— Houston [14th Dist.] 1985, pet. ref'd); *see also Manqum v. State*, 493 S.W.2d 798, 799 (Tex.Crim.App.1973). Further, the incorrect information given on the juror form was not likely to affect the juror's verdict. *See Matthias*, 695 S.W.2d at 741. Point of error seven is overruled.

Appellant complains in his sixth point of error that the trial court erred in refusing to grant his first amended motion for new trial wherein he alleged that after the jury had retired to consider punishment, it received other evidence prejudicial to appellant regarding a material issue under consideration. Appellant presented the affidavit and testimony of a juror, Pedro Leija, Jr., who stated that another juror, Ernesto Gomez, had said in the presence of the jury that the:

> man that shot Dr. Narcisco Cortez was already out and that we should give Jose Elias Gaona, Jr., sometime [sic] in the penitentiary. This way he would think about doing the same thing again ... if

we were to give him probation, he will be out very soon or in no time and possibly do it again since he had gotten off very easy.

This statement referred to another murder case previously tried in the same county, but which had nothing to do with the instant case. There was nothing in evidence in the instant case regarding the Cortez case.

Juror Leija testified that prior to Juror Gomez' statement about the Cortez case, another juror, Garciela Garcia, wanted to give appellant probation, but subsequently changed her mind. Appellant did not offer any testimony from Jurors Gomez or Garcia. The State cross-examined Juror Leija, but offered no controverting evidence.

On direct examination, Juror Leija said that after Juror Gomez' statement "we looked into more evidence and we brought some more issues out and later on, I'd say about five minutes later, she [Juror Garcia] voted what we all voted." On cross-examination Juror Leija admitted that the jury discussed and considered the facts of the case, the type of crime involved, the age of appellant, and what was good for society and best for appellant. He admitted that the jury based its decision on those discussions, and that his vote for eight years' imprisonment was his own individual decision. He also admitted that Juror Gomez' statement was made only once and was never repeated; that the jury went on to discuss other issues before Juror Garcia changed her mind; and that he did not really know what caused Juror Garcia to change her mind. We also note that Juror Leija admitted that when he made his affidavit he could not remember the last name of the doctor to which Juror Gomez had referred during deliberations.

■ As it existed at the time of appellant's trial, Tex.Code Crim.Proc.Ann. art. 40.03(7) (Vernon 1979)[3] provided in relevant part:

---

**3.** Act of June 18, 1965, ch. 722, § 1, 1965 Tex. Gen.Laws 317, 476, *repealed by* Act of June 14, 1985, ch. 685, § 4, 1985 Tex.Sess.Law Serv. 5136, 5137–38 (Vernon).

New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other:

\* \* \* \* \* \*

(7) Where the jury, after having retired to deliberate upon a case, had received other evidence; ....

In order to receive a new trial, an accused must satisfy a two-prong test by proving: (1) evidence was *received* by the jury, and (2) it was *detrimental* or *adverse* to the accused. *Eckert v. State,* 623 S.W.2d 359, 364 (Tex.Crim.App.1981); *Jones v. State,* 699 S.W.2d 580, 583 (Tex.App.—Texarkana 1985, no pet.). If there is conflicting evidence adduced about what occurred during jury deliberations, an issue of fact is raised and there is no abuse of discretion if the motion for new trial is denied. *Eckert,* 623 S.W.2d at 364; *Jones,* 699 S.W.2d at 583. However, if the evidence is uncontroverted and reflects that the jury did receive additional adverse evidence, the statute requires a new trial. *Eckert,* at 364; *Jones,* at 583.

 We find that appellant has failed to satisfy the first prong of the test, that "other evidence" be "received" by the jury. The statement made by Juror Gomez was a casual passing remark which did not lead to a general discussion. It was only mentioned once. In fact, the affiant could not even remember the last name of the doctor Juror Gomez had mentioned. A new trial is not required every time a juror mentions something not supported by the evidence. *Stephenson v. State,* 571 S.W.2d 174, 176 (Tex.Crim.App.1978); *Zuniga v. State,* 635 S.W.2d 780, 782 (Tex.App.—Corpus Christi 1982, pet. ref'd). Further, we will not consider Juror Leija's conjecture that Juror Gomez' statement caused Juror Garcia to change her mind. *Bishop v. State,* 695 S.W.2d 359, 361 n. 1 (Tex.App.—Amarillo 1985, pet. ref'd); 2 R. Ray, Texas Law of Evidence Civil and Criminal § 1428 (Texas Practice 3d ed.1980).

We hold that the trial court did not err in overruling appellant's motion for new trial, for to do otherwise would be an overly broad application of Article 40.03(7). *Zuni-*

*ga,* 635 S.W.2d at 782. Point of error six is overruled.

Appellant's points of error are overruled, and the judgment of the trial court is AFFIRMED.