**Robert Earl DENTON, Appellant,**

v.

**STATE of Texas, State.**

**No. 2–93–452–CR.**

Court of Appeals of Texas,
Fort Worth.

May 22, 1997.

Rehearing Overruled May 22, 1997.

Larry M. Moore, Law Office of Larry M. Moore, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Sylvia Mandel, Terri Moore, Assistant Criminal District Attorneys, Fort Worth, for Appellee.

Before DAUPHINOT, RICHARDS and HOLMAN, JJ.

## OPINION ON REMAND

RICHARDS, Justice.

We withdraw our previous opinion and judgment of March 13, 1997 and issue the following in its place.[1]

Appellant Robert Earl Denton shot and killed a man he discovered in bed with his estranged wife and was convicted by a jury of the offense of murder. On original submission, we determined the trial court erred in overruling defense counsel's objection to a remark made by the prosecutor during jury argument. After determining the error was not harmless beyond a reasonable doubt, we reversed the judgment below and remanded both stages of the case for new trial. *Denton v. State*, 896 S.W.2d 580 (Tex.App.—Fort Worth 1995), *rev'd*, 920 S.W.2d 311 (Tex. Crim.App.1996). The Texas Court of Criminal Appeals granted the State's petition for discretionary review and, while the Court agreed with our determination that the prosecutors made arguments that were unsupported by the record, a majority reversed and remanded the case to our court with directions that we reconsider two aspects of our harm analysis. *Denton v. State*, 920 S.W.2d 311 (Tex.Crim.App.1996). First, the Court held we improperly applied the harmless error standard by asking whether "*every*

---

1. The State filed a motion for rehearing en banc in this case. That motion was denied in a separate order.

rational juror would necessarily reject the defense and return a verdict of guilty," rather than asking whether "in light of the record as a whole, there is a reasonable possibility the argument[s] complained of might have contributed to appellant's conviction or punishment." *Id.* at 312. Second, the Court ruled we failed to consider other relevant factors, such as the overwhelming evidence of guilt on the issue of appellant's intent and its interaction with the other evidence. *Id.* at 312–13.

We have reconsidered these issues as directed by the Court of Criminal Appeals. Applying the appropriate legal standards to the facts of the instant case, we conclude reversal of both stages of the case is required.

## I. THE ERROR

■■■■ During jury argument at the guilt-innocence stage of the trial, the prosecutors

twice made highly prejudicial remarks that were unsupported by the record and injected new and harmful facts into the case. The trial court overruled appellant's objection to the first argument but sustained appellant's objection to the second argument and instructed the jury to disregard it.[2]

The only seriously contested issue at trial was whether appellant intended to kill the victim. The defensive theory advanced at trial was that appellant entered his wife's residence only to confront her and her paramour and take photographs of them together as proof of their affair. According to appellant, the gun he brought with him discharged during a struggle when his wife grabbed the barrel and pointed the gun in a "down" position. The State's theory of the case was that the shooting was intentional.

The prosecutors' improper remarks occurred during argument at the guilt-inno-

---

2. Because defense counsel did not pursue his objection to an adverse ruling in the second instance, we now hold that only the error stemming from the trial court's decision overruling defense counsel's objection to the *first* improper argument was properly preserved. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997). In the first instance, defense counsel's objection, "[t]hat's outside the record," was overruled by the trial court. In the second instance, defense counsel's objection was sustained, and the jury was instructed to disregard that particular remark. Under *Cockrell*, any error stemming from the second improper argument was waived because defense counsel did not move for a mistrial following the trial court's instruction to disregard. Nevertheless, we do not agree with the State that any error in overruling appellant's objection to the first improper argument was waived by defense counsel's failure to move for a mistrial when a second prosecutor made a somewhat similar argument. The authority cited by the State in support of their theory of waiver, *Waldo v. State*, 746 S.W.2d 750 (Tex.Crim.App.1988), a case where "*Doyle*" error—an evidentiary comment on a defendant's post-*Miranda* silence—was held cured by an instruction to disregard, is distinguished. *See Doyle v. Ohio*, 426 U.S. 610, 616–19, 96 S.Ct. 2240, 2244–46, 49 L.Ed.2d 91, 97–99 (1976). *Waldo* concerned the improper admission of evidence to which an objection was sustained and an instruction to disregard given. Here, both of the trial prosecutors made highly improper arguments. The only instruction to disregard given related to the second argument. The objection to the earlier improper argument was overruled. The Court in *Waldo* noted it

perceived "no repetition" of the error and the prosecutors in that case "made no attempt to capitalize on [the *Doyle* violation] by inviting inferences harmful to appellant's credibility or defensive posture during final argument." *Waldo*, 746 S.W.2d at 755. *Waldo's* facts stand in stark contrast to the facts in the instant case. Moreover, the first improper argument was more detrimental to the defense than the argument to which the trial court provided a curative instruction. The jurors were never instructed to disregard the statement made by the first prosecutor, "he was thinking when he told her, you're going to stand right there and you're going to watch while I kill him, and then I'm going to kill you." The instruction provided went to the second prosecutor's statement "he told her ladies and gentlemen ... you're going to stand right here and watch me while I shoot." Clearly, instructing the jury that they are not to consider the second prosecutor's remark did nothing to cure or withdraw from the jury's consideration the first prosecutor's argument.

   The State's contention that appellant waived any error in the first instance by failing to properly object in the second instance is without merit. First, defense counsel *did* object in the second instance. None of the cases cited by the State stand for the proposition that defense counsel must move for a mistrial when an improper argument is repeated in order to preserve for appellate review an earlier error by the trial court in failing to sustain an objection. Moreover, as noted above, while both arguments improperly injected new and harmful facts, the specific facts related in the arguments were different.

cence stage. In the first instance, the prosecutor, without any support in the record, told the jurors that immediately before the trigger was pulled, appellant made oral statements indicating his intent to kill the deceased and kill his wife:

> [Appellant] was thinking *when he told her, you're going to stand right there and you're going to watch while I kill him, and then I'm going to kill you.* He was thinking when he took that safety off that shotgun. [Emphasis added.]

In the second instance, the other prosecutor, also without any support in the record, told the jurors that appellant told his wife she should watch him shoot the weapon:

> She tells him, shoot me, and—you know, and [defense counsel] says, well, he could have killed them both. Why didn't he kill her first? [Defense counsel] said because *he told her ladies and gentlemen, he's going to make her pay, see, for her infidelity. You're going to stand right here and watch me while I shoot—*[objection interposed]. [Emphasis added.]

These remarks were totally outside the record. There was no testimony indicating what, if anything, appellant said to his wife immediately prior to the shooting. Therefore, the ultimate issue concerning the first remark is whether the trial court's error in overruling appellant's objection was harmless beyond a reasonable doubt.

## II. RULE 81(B)(2)

The determination of whether trial error requires reversal is governed by our rules of appellate procedure:

> If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

Tex. R. App. P. 81(b)(2).

In conducting an analysis under this rule, the appellate court must ask whether, in light of the record as a whole, there is a reasonable possibility the argument might have contributed to the defendant's conviction or punishment. *Denton,* 920 S.W.2d at 312 (quoting *Orona v. State,* 791 S.W.2d 125, 128 (Tex.Crim.App.1990)). The court must examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Crim.App.1989). In addition, the court must consider how much weight a juror would probably place upon the error and determine whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.*

Analyzing these factors, we must calculate as much as possible, the probable impact of the error on the jury in light of the existence of other evidence. *Id.* Thus, the presence of overwhelming evidence of guilt plays a determinative role in resolving the issue. But we should not focus on the propriety of the outcome of the trial. Instead, we must be concerned with the integrity of the process leading to the conviction. It is the effect of the error and not the existence of overwhelming evidence or the lack thereof that dictates our judgment. *Id.*

Recently, the Court of Criminal Appeals held that in conducting a harmless error analysis, it is largely irrelevant that the evidence sufficiently, or even overwhelmingly, supports the verdict:

> [W]here the standard of harm is whether the record on appeal justifies a conclusion beyond a reasonable doubt that the error made no contribution whatsoever to the actual verdict, it is largely irrelevant that the evidence sufficiently, or even overwhelmingly, supports the verdict. We are concerned with the effect of the error upon real jurors, and it would not be proper to assume that an error at trial had absolutely no impact upon them just because the evidence was otherwise sufficient for a finding of guilt.

*Atkinson v. State,* 923 S.W.2d 21, 26 (Tex. Crim.App.1996).

## III. APPLICATION OF THE FACTORS

### A. The Source of the Error

■ The source of the improper remark at issue in this case was the trial prosecutor.

The State suggests that both parties were, in effect, sources of the remark, because the prosecutor was responding to an argument made earlier by defense counsel. In this argument, defense counsel referred to an even earlier argument by the prosecutor suggesting that appellant actually intended to kill both his wife and Clayton Brown:

> Why didn't Robert—if Robert went over there to kill her and Clayton Brown, why did he take two bullets? Why did he shoot him through the couch? That's kind of a chancy deal. You have only got two shots. You have got two people you are trying to snuff here. Let's shoot through this couch and hope we hit him good. That leaves us one shot to try to get her with.

> Why—instead of taking the picture, why don't we just plug her right there? When I walk in the room, if that's my intent, why shoot him through the couch first and then worry her? That doesn't make sense. It didn't happen that way.

Nothing in this argument leads us to conclude the source of the error was shared by the defense. First, the record reflects the prosecutor's first improper comment, the objection to which was erroneously overruled by the trial court, occurred *prior to* defense counsel's argument. Therefore, it is not possible that the defense was a source of the error. Moreover, even if we were to apply the State's theory to the second instance of improper argument by the State, the theory of a "shared source" of error by the defense still fails. Defense counsel's jury argument invited a response by the prosecutor; howev-

er, defense counsel did not, through his remarks, invite an *improper* response. Here, the prosecutor ventured beyond all permitted areas of jury argument, and beyond the scope of any invitation, when she went outside the record and informed the jurors of "statements" made by the appellant immediately prior to the shooting that the jurors had not heard from the witness stand.

### B. The Nature of the Error

The nature of the error was the trial court's "stamp of approval"[3] on an improper jury argument in which the prosecutor was permitted to go outside the record and refer to evidence which, if believed, unequivocally established appellant's intent to kill the victim.

### C. Whether or to What Extent Emphasized by the State

The record reflects similar improper remarks were twice[4] made by the State. In the first instance, defense counsel's objection was overruled; in the second, the trial court sustained defense counsel's objection and instructed the jurors to disregard the remark.

### D. Probable Collateral Consequences and the Weight a Juror Would Place on the Error

As to the probable collateral consequences and the likely effect of the error on the jury, we believe it cannot be determined beyond a reasonable doubt the jurors were not swayed by the State's argument. The

3. See *Burke v. State*, 652 S.W.2d 788, 790 (Tex. Crim.App.1983).

4. The State urges us not consider the prosecutor's repetition of the argument as a factor favoring the defendant because to do so would be tantamount to a revival of the disfavored doctrine of cumulative error. We do not agree. The State's repetition of the improper argument cannot be an example of cumulative error since the trial court committed no error in the second instance. See *Cockrell*, 933 S.W.2d at 89 (defendant must show that he pursued trial objection to an adverse ruling in order to successfully urge trial error). Contrary to the trial court's earlier ruling, when the prosecutor repeated her improper argument, the court sustained defense counsel's second objection and instructed the jury to disregard the remark. Defense counsel

did not move for a mistrial and, in failing to pursue his objection to an adverse ruling, counsel failed to preserve trial error as regards the second improper argument. Our notation that the second prosecutor made a similar improper argument is part of the Rule 81(b)(2) analysis required under *Harris*. The Court of Criminal Appeals has indicated that, in instances where the appellate court determines the trial court has erred, the court must consider whether and to what extent the improper remark was emphasized by the State. *Harris*, 790 S.W.2d at 587. Our determination that the record reflects the prosecutor twice made the improper remark is part of our Rule 81(b)(2) analysis and should not be construed as application of a cumulative error doctrine.

prosecutor's reference to evidence outside the record went to the heart of the defense and the only seriously disputed issue in the case—appellant's intent. The State suggested during oral argument on remand that we should recognize a trend away from the significance and importance of jury arguments generally, citing the public perception following the now infamous Simpson criminal trial in California as an example of the public's present low regard for lawyers. The State's theory is apparently based on the premise that lawyers are less trusted by jurors now than in the past; hence, improper jury arguments by lawyers carry less impact now than similar arguments in the past. We decline the State's invitation to hold that jury arguments have become less significant. We have no data on which to measure the State's theory, and certainly cannot conclude, as a matter of law, that jury arguments are any less a significant part of a criminal trial than in our past. In addition, one probable collateral consequence of the error is a reasonable possibility that the sentence recommended by the jury, which was near that recommended by the State, may have, at least in part, been the result of the trial error.

### E. Encouraging Repetition

We agree with the State that the record does not show a "pattern and practice" on behalf of the State of similarly improper arguments. *See Byas v. State,* 906 S.W.2d 86, 88 n. 2 (Tex.App.—Fort Worth 1995, pet. ref'd). Nor do we find the improper remark was the result of any intentional misconduct on the part of the prosecutors.[5]

### F. Overwhelming Evidence of Guilt

The Court of Criminal Appeals reversed our prior decision and remanded the case to us after ruling that we improperly conducted our harm analysis because we did not consider the "overwhelming evidence of guilt on the issue of appellant's intent and its 'interaction

with the other evidence.'" *Denton,* 920 S.W.2d at 312 (citing *Harris,* 790 S.W.2d at 586). As directed, we will now proceed with that analysis.

### 1. The evidence supporting the State's theory the deceased was intentionally shot.

The State contended that the shooting was intentional, not accidental. Myra Brown, the deceased's widow, testified that appellant phoned her at approximately 3:00 a.m. on September 23, 1989, and inquired as to whether she knew where her husband was. When Myra responded "No" appellant told her "well, I caught the son of a bitch with my wife and I'm going to kill him." Brown testified she begged appellant not to kill her husband.

Approximately twenty minutes later, police officers were dispatched to the apartment residence of Pamela Denton, appellant's estranged wife, to investigate a reported shooting. Police Sargent Avin Carter arrived first. Appellant was standing in the open doorway of the apartment and told Carter, in response to his question "what's going on" that he had "shot the guy inside." Carter looked inside and saw the body of a black male on the floor. Appellant told Carter that he shot the deceased with a .12–gauge shotgun slug, that he had caught the deceased in bed with his wife, and that his wife had run down the street. Appellant also advised Carter that he put the shotgun inside the hallway closet of the apartment.

Steven Putthoff, a Tarrant County Deputy Medical Examiner, performed the autopsy and determined the deceased died as the result of a shotgun slug wound to his right chest. Richard Ernest, a firearms examiner employed by the Tarrant County Medical Examiner's Office, examined the shotgun used in the shooting and testified it was in good working order with no mechanical

---

5. During oral argument defense counsel agreed that it was probable the prosecutors simply confused statements attributed to appellant in written police reports contained in the State's file that were *not* introduced at trial, with testimony that *was* introduced. The trial prosecutors whose remarks are the subject of this appeal are experienced trial lawyers and well-respected advocates for the State. Our decision today does not turn on their intent, but rather on whether we can determine, beyond a reasonable doubt, the trial error made no contribution to appellant's conviction or punishment.

weaknesses. The only way the weapon could be fired, according to Ernest, was to pull the trigger.

In addition, the record reflects that appellant's wife, Pamela Denton, was not called by appellant to testify on his behalf. The only conclusion the trial prosecutors sought to have the jurors draw from appellant's failure to call her as a witness was contained in the somewhat cryptic remark, "[a]nd the defense surely didn't call Pamela Denton to come up here and vouch for this man's life."

## 2. The evidence supporting the defense's theory that the shooting occurred during a struggle over the gun and was unintentional.

The defensive theory advanced in the trial court was that the shooting was not intentional and occurred during a struggle over the gun, although appellant suffered from what could be characterized as convenient memory lapses, particularly in regard to the threat he allegedly made to the deceased's wife. Appellant provided the police authorities with a written statement detailing the events that he alleged occurred that evening. He also testified at trial.

According to appellant, the following sequence of events culminated in the shooting. On September 22, 1989, Pamela Denton invited appellant to her apartment for dinner. By that date, appellant had been separated from Pamela for approximately one week. After supper, their children went off to play while Pamela and appellant talked. On two occasions during their discussion the phone rang. Each time appellant answered the phone, but the unidentified party on the other end hung up. Appellant was suspicious that Pamela was romantically involved with someone else because, before she moved out of his home he was receiving similar "hang-up" phone calls, but after she moved out the calls ended. Appellant asked Pamela whether she was, in fact, seeing someone and she answered, "No." No further conversation on the subject took place and subsequently, appellant returned to his home while their children remained at Pamela's apartment.

While cleaning up his house, appellant began thinking about the hang-up phone calls.

He decided that he would put a recorder on Pamela's phone to determine for himself whether she was having an affair. The same night, he returned to her apartment and hooked an electronic recorder to an outside phone line. He then let himself into the apartment with a key to determine whether the phone and recorder were properly installed. When he entered the apartment he saw his wife in bed with a black male. He could not identify the man at that time. But as he left the apartment he saw a car parked outside that looked similar to the car driven by Pamela's boss, Clayton Brown, a black male. Appellant testified that he became convinced Brown was the person he saw in bed with his wife when he looked inside the car and saw papers and books bearing the name "Guckenheimer," the name of the company where his wife was employed. Appellant decided that, in the event Pamela sought custody of the children, photographs of her in bed with Brown would benefit him. Appellant flattened the tires of Brown's car to prevent him from leaving. He then drove home, obtained his camera, and returned to the apartment. When he attempted to open the door, Pamela tried to keep him from entering. She told him to leave and asked him what he was doing there. He took her picture. Then she ran into the living room. According to appellant, he realized he brought his shotgun with him only after Pamela told him to give her the gun. After Pamela unsuccessfully repeated her demand for the gun, she struggled with him and the gun went off. Pamela ran outside and, as appellant looked at the bed, he saw feet under the bed and heard Brown moan. Appellant then realized he had shot Brown and that the police and an ambulance should be summoned. He put the gun in the closet and began knocking on neighbors' doors and yelling for someone to call 911.

In addition to relying on his own testimony, appellant offered circumstantial evidence to convince the jurors that a reasonable doubt existed as to whether the shooting was intentional. Appendix one is a photograph taken by appellant after he entered the apartment and only moments before the shooting. According to appellant, his motive

for taking the picture was to document the fact that his wife was sleeping with her boss, in order to assist him in obtaining custody of their children. Although the jury ultimately rejected appellant's claim that the shooting was accidental, it would not have been unreasonable for the jurors to believe appellant and return a not guilty verdict.

### 3. Whether the defensive theory was con-..dicted by the position of the deceased at the time of the shooting.

◼ The Court of Criminal Appeals' opinion contains the following statement.

> The evidence further shows the victim died from a gunshot wound to the *chest*. This evidence was undisputed. At trial, appellant testified the shotgun "went off" when he and his wife were struggling over it and "she jerked it *down*." *Denton*, 896 S.W.2d at 583 (Emphasis Supplied). Thus, appellant claimed the victim was accidentally shot in the chest while the shotgun was pointed down.
>
> Based on the foregoing, we vacate the judgment of the Second Court of Appeals and remand the cause to that Court for further proceedings consistent with this opinion.

*Denton*, 920 S.W.2d at 313 (emphasis in original).

We are admittedly perplexed by the recitation of facts set forth by the Court of Criminal Appeals. Apparently, the majority of that court found that the defendant's testimony that the gun was pointed down at the time it was fired could not have reasonably supported a verdict of acquittal because the undisputed evidence showed the victim was shot in the chest. By not setting forth all of the details of the trial testimony in our earlier opinion we may have unintentionally contributed to that misunderstanding of the record by the higher court. It is true appellant testified the gun was pointed down when it went off. It is also true the victim was shot in the chest. The majority opinion does not recognize however, that the record unequivocally shows that the victim was lying on the floor attempting to hide under a fold-a-way bed at the time the gun was fired, and that all of the evidence, including that introduced by the State, indicates the gun was, in fact, pointed down at the time it was fired. Appendix one shows appellant's wife standing between appellant and the bed. The victim can be seen on the floor under the bed. None of the evidence relating to the angle at which the shotgun was fired is inconsistent with the appellant's testimony that the gun was pointed "down" when it was fired.[6] Both

**6.** During oral argument the State conceded the gun was pointed down, but suggested that the appellant's theory the shooting was accidental was contradicted by the following testimony by appellant:

> [Pamela] lunged at me, and I brought the gun up to protect myself like this (indicating). And we was fighting over the gun, and she was fighting me, and she pulled down on the gun with a jerk and it went off. And we both jumped because we was in shock from the gun going off. She looked at me and she shoved me back and she was gone.

According to the State, this testimony shows the shooting was not accidental, because under this version of events, Pamela Denton, who was not injured, would necessarily have been in the line of fire and would have sustained injury in the blast. We do not agree that the above testimony indicates Pamela Denton was in the line of fire at the time the gun discharged.

In its motion for en banc rehearing, the State contends that in deciding this issue the court does not have the benefit of two critical factors which were available to the jurors: (1) the demonstration by appellant of where the parties were and how he held the weapon; and (2) appellant's

testimonial demeanor. From this premise, citing *Gaona v. State*, 733 S.W.2d 611, 613 n. 1 (Tex. App.—Corpus Christi 1987, pet. ref'd), and *Wawrykow v. State*, 866 S.W.2d 87, 90 (Tex.App.—Beaumont 1993, pet. ref'd), the State next argues that ambiguities in the record should be resolved in favor of the jury's verdict, i.e., in a light most favorable to the State. We agree with the State's initial premise. The appellate record *is* silent as to both the demonstration referred to above and appellant's testimonial demeanor. However, *Gaona* and *Wawrykow* involved defense challenges to the sufficiency of the evidence. A much different rule applies when the reviewing court is conducting a harm analysis under Rule 81(b)(2).

In *Harris*, 790 S.W.2d at 586, the Court of Criminal Appeals held that analysis under our harmless error rule requires the appellate court to evaluate the entire record in a neutral, impartial, and even-handed manner, *not in the light most favorable to the prosecution*. We cannot say, based on a neutral and impartial reading of the record, that the above testimony indicates Pamela Denton was in the line of fire at the time the gun discharged. We also cannot say, based on a neutral reading of the record, that appel-

under the State's theory and the defense theory, the gun was pointed down.[7] The only issue in dispute was appellant's intent to shoot the victim.

### G. Conclusion as to Whether the Error was Harmless Beyond a Reasonable Doubt

■ Having considered the evidence of guilt and its interaction with other evidence, we cannot conclude the evidence was so overwhelming as to negate the reasonable possibility the argument complained of might have contributed to appellant's conviction or punishment.

This case required the jurors to determine whether appellant was truthful or untruthful when he testified that he did not intend to kill the victim and that the gun went off during a struggle with his wife. As an appellate court, we are particularly unsuited for determining credibility issues. Our review of the record, which is admittedly devoid of evidence of many things important to the trier of fact, such as demeanor, leads us to believe the defense had the weaker case in the trial court. Certainly, it

is reasonable to believe that absent the improper jury argument advanced by the State in this case, a jury might reject the defensive theory advanced by the appellant, perhaps after carefully weighing his assertions against the inculpatory statement made by him in the prior telephone call to the victim's wife. However, it is also reasonable to believe that, without the improper argument, a rational jury might accept such a defense and find a reasonable doubt as to appellant's guilt, perhaps questioning why a man intent on committing murder would pause to take photographs of his estranged wife and her lover for use in a child custody battle. Under Rule 81(b)(2) we must reverse the case for new trial unless we determine beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment. We cannot hold the error stemming from the improper jury argument made by the prosecutor in this case harmless under this test.[8]

Point of error four is sustained, the judgment of the trial court is reversed, and the case is remanded for a new trial.[9]

---

lant's demeanor was bad. We simply do not know. The State suggests that the best evidence that appellant was not credible was the jury's verdict; however, such reasoning is clearly circular. The issue is whether there is a reasonable possibility the improper jury argument might have contributed to the conviction or punishment, not whether there is sufficient evidence to uphold the verdict. In *Mayes v. State*, 816 S.W.2d 79, 88 (Tex.Crim.App.1991), the Court of Criminal Appeals stated that there is no burden of persuasion on the State in the sense that it bears the responsibility to come forward with arguments establishing the harmlessness of the error; however, the court went on to note that the State "will indeed suffer reversal on appeal if the reviewing court cannot determine after its examination of the record that an error was harmless beyond a reasonable doubt." *Id.*

7. Tarrant County Deputy Medical Examiner Dr. Stephen Putthoff testified the victim died from a shotgun slug wound to his right chest. He testified the slug entered the body at "a somewhat oblique angle," and that it was directed "somewhat down and somewhat left to right." When the prosecutor asked how far the muzzle of the

weapon was from the victim assuming the victim was lying down with a blanket and a mattress between his body and the shotgun at the time he was shot, Dr. Putthoff responded the range of fire would be "distant." When the prosecutor asked where the shooter would have been assuming that the victim was lying on his back underneath a sofa bed, Dr. Putthoff responded that the shooter would have been standing above the victim's left shoulder.

8. The State argues in its motion for rehearing en banc that we are merely acting "under the guise of assessing harm," but actually sitting as a thirteenth juror. The State then again urges us to conclude that "[the prosecutor's] blistering cross-examination, not the argument, caused the jury to convict." It is our view that the role the State would have us play is more in line with that of a thirteenth juror. In any event, we do not hold that the prosecutor's "blistering cross-examination" is the "cause" of appellant's conviction.

9. Because we reverse the judgment of the trial court based on point of error four, we do not reach points of error three, five, six, seven, and eight.