02-09-357-CR














 

 

 

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

 

NO.  02-09-00357-CR


 

 


 
 
 Shawn Kelly Vince Vinson a/k/a
 Shawn Kelly Vinson a/k/a Shawn Vince Vinson
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE 
 
 


 

 

------------

 

FROM THE
355th District Court OF Hood COUNTY

------------

MEMORANDUM
OPINION[1]

----------

I. Introduction

Appellant
Shawn Kelly Vince Vinson, a/k/a Shawn Kelly Vinson and Shawn Vince Vinson, appeals
his two convictions for aggravated assault with a deadly weapon.[2]  In two points, Appellant contends that the
evidence is legally and factually insufficient to establish the aggravating
element of the assaults—that he used or exhibited a deadly weapon.  We affirm. 

II. Factual Background

On
September 4, 2008, Tracy Geer was driving his fourteen-year-old daughter Tara
and his twelve-year-old son Julian home from school when Appellant suddenly
backed his car out onto the roadway, causing Geer to slam on his brakes to
avoid an accident.  As both cars moved
forward, Geer began tailgating Appellant, who then slammed on his brakes.  As Geer attempted to pass, Appellant angled
his car across the road and stopped. 
When Geer attempted to back up, Appellant followed.  Finally, both men stopped, exited their cars,
and exchanged words.  Geer testified that
Appellant hopped out of his car and hollered, “You want some, Bitch?” and “Do
you want some?”  As he approached Geer,
Appellant “made sure” Geer saw him open what “looked like a utility kind of
knife, that—the newer ones that you pop open.” 
In response, Geer threw up his hands and said, “Okay.  Dude. 
I didn’t know you was [sic] going to come out with a knife.”  As Geer turned to walk back to his car,
Appellant approached him from behind, grabbed him by the neck, and stuck the
knife’s blade to his throat.  As the
knife was “sticking” into his throat, Geer felt a “stinging.”[3]  In describing how he felt when he saw the
knife, Geer testified, “Well, I guess you could say scared, yeah, scared for me
and my kids.”  He then explained that he
was “scared maybe he—I would end up getting killed, cut, killed or whatever
right in front of my kids.”  Geer
testified that he felt like there was an imminent threat to his person.  When Appellant finally released him, Geer got
inside his car and saw “all the blood.”  

Geer
felt trapped when he noticed Appellant hovering around the back of the
car.  In an attempt to get Appellant to
move his car and let them leave, Geer pulled out his nine millimeter pistol
(for which he had a valid concealed handgun license) from the glove compartment
and exited his car.  Upon seeing the gun,
Appellant ran toward Geer, yelling, “You want some more, bitch?  What do you got there? What have you got
there?”  As the two men stood within five
feet of one another, Appellant “threw a punch” and “cold-cocked [Geer],”
breaking his sunglasses in half and popping his head back.  Geer responded by shooting Appellant in the
leg.  Appellant stepped back and sat down
on the ground. Appellant’s claimed common-law wife, Amanda, who had been riding
with Appellant, hopped out of the car and went to Appellant’s side.[4]  

As
Geer paced back and forth, Appellant stated, “It’s okay.  You can go ahead and go.  Just – just leave.  I’ll take care of this.  Just go.” 
Geer got into his car and drove approximately 100 yards, but then told
his daughter to call 9-1-1 and returned to the scene.  As he waited for the authorities, Geer heard
Appellant say to a few people gathered around: “We got in an argument and he
shot me.”  When Geer approached the group
and stated, “because he brought out a knife and stuck me with it,” Appellant
responded, “What knife?  There’s no
knife.”  After an emergency medical technician
(EMT) cleaned Geer’s wound, Geer went to the police station and gave a
statement.[5]

Geer’s
children, Tara and Julian, witnessed much of the incident from inside the
car—Julian sitting in the front passenger seat and Tara sitting in the
back.  They generally corroborated the
events described by their father.[6]  Tara testified that both men were making hand
gestures and glaring at one another before getting out of their cars.  As Appellant approached their car from
behind, her father threw up his hands and said, “All right, buddy.  I didn’t think you had to pull out a knife.”  When her father turned around to walk back to
their car, Appellant approached him from behind holding “something silver in
his hand” that he “swung up.”  Tara
testified that “when he put my dad in a headlock, I’m guessing he stabbed
him.”  After a minute, Appellant released
her father, who got into the car with blood all over his shirt.  Tara could not see her father’s wound.  During cross-examination, Tara testified that
she saw “a flash of silver,” that she was “pretty sure it was a knife,” and that
she did not see the knife’s size.  

Julian
testified that, when his father and Appellant exited their cars, they were
making faces and hand gestures and were yelling at one another.  Julian heard his father yell, “What the hell
is your problem?”  Julian testified that,
as the two men approached one another, his father said, “Man, I didn’t know you
were going to pull out a knife.”  As his
father turned and walked back to the car, Appellant grabbed him from behind and
put his arm over his neck.  From inside
the car, Julian could see only the two men from their chests down and could not
see Appellant’s hands or whether he had a knife.  After Appellant ordered Geer back inside the
car, Julian saw a cut on his father’s neck and blood all over his shirt.[7]  

Several
other individuals witnessed various aspects of the offense.  Three young adults, Alston Herring, Ashley
Watson, and Brandon Bobo, were riding in the car together when they saw two
cars parked on the side of the road and two men arguing.  They remained in their car parked
approximately thirty yards away.  Herring
testified that one individual approached the other carrying “what looked like a
knife in his hand,” although Herring was not “a hundred percent sure” it was a
knife.[8]  He saw the two men engage in a struggle and
then separate.  When defense counsel
asked Herring if he was speculating that Appellant had a knife in his hand,
Herring stated, “[F]rom what I saw with the man on the cut on his neck,
obviously it was [a] knife, some kind of sharp object.”  Ashley Watson testified that she did not
remember seeing a knife.  Brandon Bobo
testified that, as the two men (whom Bobo identified in court as Appellant and
Geer) argued, Geer turned around toward his car.  Appellant suddenly grabbed Geer from behind,
and the two men scuffled.  Bobo testified
that “[t]here was definitely something in [Appellant’s] hand.  If – I don’t know – there was definitely a
blade.  I don’t know if it was a steak
knife, pocket knife, what it was.”[9]  

EMT
Samuel Daugherty testified that he was dispatched to the scene and that he
cleaned Geer’s wound and covered it with gauze.  Daugherty’s written report stated in part,
“Patient states that he was assaulted by an individual and was struck in the
head and neck with what appeared to be a box cutter.”  Daugherty’s report also stated that Geer’s
neck laceration was one-half or .5 centimeters deep and about the size of a
fingernail, and it described Geer’s wound as a “minor laceration.”  When defense counsel asked Daugherty if
Geer’s laceration could have been caused by “anything,” he replied, “Obviously
some kind of trauma was sustained.”  

Several
witnesses testified that the knife was never recovered from the crime
scene.  Geer identified a knife—displayed
by the State for demonstrative purposes only—as similar to the knife used by
Appellant.[10]  Geer demonstrated Appellant’s use of the
knife as he approached.  Lieutenant Johnny
Rose testified that he was a fifteen-year veteran in the Hood County Sheriff’s
Department and that, in his opinion, a box cutter is a knife and is capable of
causing death or serious bodily injury. 
When shown the State’s demonstrative knife, Lieutenant Rose testified
that it was “definitely” the type of knife that is capable of causing death or
serious bodily injury.  Patrol Lieutenant
Jim Cromwell testified that he had thirty years of law enforcement experience
and that he also participated in this investigation.  Regarding the State’s demonstrative knife,
Cromwell testified that, “without a doubt,” “that knife is capable of creating
serious bodily injury.”  The State also
presented evidence suggesting that Amanda removed Appellant’s knife from the
crime scene.[11]    

Appellant
did not testify.  His primary defensive
theory during the guilt phase of trial was that the two men engaged in mutual,
hand-to-hand combat but that he never used or exhibited a knife.    

III.
Procedural Background

Appellant
pleaded not guilty to a two-count indictment charging him with (1)
intentionally, knowingly, or recklessly causing bodily injury to Tracy Geer by
cutting his neck and (2) intentionally or knowingly threatening imminent bodily
injury to Tracy Geer.  Both counts alleged
that Appellant “use[d] or exhibit[ed] a deadly weapon during the commission of
the assault, to wit: a knife, that in the manner of its use or intended use was
capable of causing death or serious bodily injury.”  As to each count, the jury found Appellant
guilty of aggravated assault with a deadly weapon as charged in the indictment.[12]  During the punishment phase, Appellant
pleaded “true” to two enhancement paragraphs alleging prior sequential felony
convictions for assault of a public servant and burglary of a building.  The jury assessed punishment at ninety-nine years’
confinement for each count (to run concurrently), and the trial court sentenced
Appellant accordingly.  The trial court’s
judgment in each case reflects an affirmative deadly weapon finding.  

IV.
Sufficiency of the Evidence

     In two points, Appellant contends that the
evidence is legally and factually insufficient to support the jury’s finding
that the knife used or exhibited during the assault was a deadly weapon.[13]  

 

 

 

A. 
Standard of Review

The
court of criminal appeals recently held that there is “no meaningful
distinction” between a legal-sufficiency standard under Jackson v. Virginia[14] and a factual-sufficiency standard
under Clewis v. State.[15]  Brooks
v. State, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).  “[T]he Jackson
v. Virginia standard is the only standard that a reviewing court should
apply in determining whether the evidence is sufficient to support each element
of a criminal offense that the State is required to prove beyond a reasonable
doubt.  All other cases to the contrary,
including Clewis, are
overruled.”  Id.  Accordingly, we will
conduct a single review of Appellant’s sufficiency complaints under the Jackson standard, which asks whether, in
considering all the evidence in the light most favorable to the verdict, the
jury was rationally justified in finding guilt beyond a reasonable doubt.  See
Jackson, 443 U.S. at 391, 99 S. Ct.
at 2789; Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007).  

B.    Discussion

A
weapon can be deadly by design or use.[16]  See Tex.
Penal Code Ann. § 1.07(a)(17)(A), (B). 
An ordinary knife is not a deadly weapon per se; that is, it is not an
object manifestly designed, made, or adapted for the purpose of inflicting
death or serious bodily injury.  Id. § 1.07(a)(17)(A); Tucker v. State, 274 S.W.3d 688, 691
(Tex. Crim. App. 2009) (citing McCain v.
State, 22 S.W.3d 497, 502–03 (Tex. Crim. App. 2000)).  Instead, a knife becomes a deadly weapon if,
in the manner of its use or intended use, it is capable of causing death or
serious bodily injury.  Tex. Penal Code
Ann. § 1.07(a)(17)(B); McCain, 22
S.W.3d at 503.  The State’s indictment
and the court’s jury instructions tracked this statutory language, and the
State bore the burden of proving that Appellant “use[d] or exhibit[ed] a deadly
weapon during the commission of the assault, to wit: a knife, that in the
manner of its use or intended use was capable of causing death or serious
bodily injury.”   

          Citing Thomas v. State, Appellant initially contends that the State bore
the burden of proving that he used, or intended to use, the knife in a manner
that would cause death or serious bodily injury.[17]  See
821 S.W.2d 616, 620 (Tex. Crim. App. 1991) (stating in part that “utility
knives . . . do not qualify as deadly weapons unless actually used or intended
to be used in such a way as to cause death or serious bodily injury”).  Appellant asserts that a rational trier of
fact would have had a reasonable doubt about this “manner of use” prong because
the evidence demonstrates that he was merely “trying to run off Geer, not kill
him.” Appellant emphasizes that (1) he never threatened to kill Geer; (2) any exhibition
or use of a knife was for a “short duration”; (3) Geer suffered only a minor
wound; and (4) Geer escaped from—or was released by—Appellant and got back into
his car.   

Appellant’s
reliance on Thomas is misplaced.  The court of criminal appeals has held that
the State is not required to prove specific intent to use the object as a
deadly weapon:

The provision’s plain
language does not require that the actor actually intend death or serious
bodily injury; an object is a deadly weapon if the actor intends a use of the
object in which it would be capable of causing death or serious bodily injury.  The placement of the word “capable” in the
provision enables the statute to cover conduct that threatens deadly force,
even if the actor has no intention of actually using deadly force.

 

McCain, 22 S.W.3d at 503
(citing Tisdale v. State, 686 S.W.2d
110, 114–15 (Tex. Crim. App. 1984)); see
Bailey v. State, 38 S.W.3d 157, 158–59 (Tex. Crim. App. 2001) (quoting McCain). 
Notably, the McCain court also
explained that the language in its earlier Thomas
opinion—stating that certain objects are not deadly weapons “unless actually
used or intended to be used in such a way as to cause death or serious bodily
injury”—was “somewhat misleading” in that it made a “short-hand reference to
subsection (B)’s requirement while the Court focused upon the applicability of
subsection (A).”[18]  McCain,
22 S.W.3d at 503.  The court noted that
“[a] subsequent paragraph in the opinion rectifies this omission by including
the word ‘capable’ in its discussion.”  Id. 
Thus, we rely on the above-quoted language in McCain in analyzing Appellant’s claim.  

Here,
Geer testified that Appellant hopped out of his car, displayed an open utility
knife, and stated angrily, “Do you want some, Bitch.  Do you want some?”  Appellant then wrapped his arm around Geer’s
neck, stuck the point of a blade to his throat, and cut him.  Geer testified that he was scared Appellant
would kill him or “cut him up” in front of his kids and that he felt an
imminent threat to his person. 
Additionally, Geer reenacted how Appellant approached him with the knife.  When the prosecutor demonstrated how the
knife opened, Geer agreed that Appellant opened his knife that way.[19]  Based on the evidence, the jury could have
reasonably construed Appellant’s words as threatening harm or injury[20] and his
conduct as assertive and aggressive.  The
jury also could have reasonably considered that Appellant cut Geer in a
particularly vulnerable part of the body.[21]  Thus, the evidence was sufficient for the jury
to conclude that Appellant intended a use of the knife in which it would be capable
of causing death or serious bodily injury. 
See id. at 503.  Cf.
Stewart v. State, 198 S.W.3d 60, 63–64 (Tex. App.—Fort Worth 2006, no pet.)
(holding that knife taken by defendant from the victim’s residence during the
burglary was capable of causing serious bodily injury or death but that there
was no evidence that, in the manner of its use or intended use, it was capable
of causing such injury where defendant never threatened, tried to stab, cut, or
otherwise hurt victim with the knife).  

Appellant
additionally asserts that a rational juror could not have concluded that the
knife was capable of causing serious bodily injury because there is no evidence
that it was functioning.  In support of
his position, Appellant cites Mosley v.
State, 545 S.W.2d 144, 145–46 (Tex. Crim. App. 1976).  The Mosley
court held that, in an assault-by-threat prosecution, an unloaded BB gun was
not a deadly weapon where the testimony showed that the gun’s pellets would not
penetrate the skin; that it was never pointed at the victim’s face; and that
the defendant never used the gun or threatened to use it as a bludgeon.  Id.  Appellant emphasizes that, in his case (1)
the knife was never recovered (and therefore no one examined it); (2) the demonstrative
knife was insufficient to establish, and should not be used to determine,
whether the actual knife functioned either fully or partially and how far the
blade was capable of protruding; and (3) Geer failed to testify to the size,
length, or sharpness of the blade of either the actual or the demonstrative
knife.   

The State
need not introduce the weapon into evidence when
the victim describes the weapon and the manner in which it was used.  Billey
v. State, 895 S.W.2d 417, 420 (Tex. App.—Amarillo 1995, pet. ref’d) (citing
Morales v. State, 633 S.W.2d 866, 868
(Tex. Crim. App. 1982)); see Magana v.
State, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref’d).  Further, Texas caselaw permits counsel to use
jury aids that are not admitted into evidence to assist the jury in
understanding the evidence actually introduced. 
Garner v. State, 939 S.W.2d
802, 807 (Tex. App.—Fort Worth 1997, pet. ref’d); see Runnels v. State, 193 S.W.3d 105, 114 (Tex. App.—Houston [1st
Dist.] 2006, no pet.) (Keyes, J., concurring); Buie v. State, No. 14-95-00620-CR, 1998 WL 507750, at *11 (Tex.
App.—Houston [14th Dist.] Aug. 20, 1998, no pet.) (not designated for
publication) (citing Garner).  Jurors are entitled to use their common
knowledge and experience to make connections in terminology, and they are free
to use their common knowledge, observation, and experience gained in the
ordinary affairs of life when giving effect to the inferences that may be
reasonably drawn from the evidence.  Wawrykow v. State, 866 S.W.2d 87, 88–89
(Tex. App.—Beaumont 1993, pet. ref’d) (citing United States v. Heath, 970 F.2d 1397, 1402 (5th Cir. 1992)); see Moore v. State, No. 03-98-00584-CR,
1999 WL 816743, at *2 (Tex. App.—Austin Oct. 14, 1999, no pet.) (not designated
for publication) (noting that juries can use common knowledge and experience to
determine that a box cutter is also known as a utility knife).  Consequently, Appellant’s complaints
regarding the unavailability of the actual knife, the State’s use of a
demonstrative knife, and Geer’s description of the knife’s blade are without
merit.        

Further,
the Mosley case cited by Appellant is
inapposite.  Unlike the affirmative
evidence in Mosley that the BB gun
was not capable of causing death or serious bodily injury, there was evidence
in Appellant’s case from which a jury could have rationally inferred that
Appellant’s knife was capable of causing death or serious bodily injury.  See
Adame v. State, 69 S.W.3d 581 (Tex. Crim. App. 2002).  In Adame,
the defendant entered a convenience store with a BB gun; the store clerk feared
for her life when he pointed the gun at her and demanded all the money; and a
police investigator testified that the defendant’s BB gun “could cause serious
bodily injury if it were pointed and fired at someone.”  Id.
at 581.  The intermediate appellate court
held that the evidence was insufficient to support the jury’s deadly weapon
finding because the State did not present evidence that the BB gun was loaded.  Id.  The court of criminal appeals concluded,
however, that whether the gun was loaded was not significant to the
analysis.  Id. at 582.  “What is
significant is that appellant’s BB gun was capable of causing serious bodily
injury.”  Id. (citing McCain, 22
S.W.3d at 503 and comparing Mosley,
545 S.W.2d at 145–46).  The court stated
that it is not necessary to place an additional evidentiary burden on the State
to affirmatively prove that a BB gun was loaded at the time of the commission
of the offense. Id.  “[I]n proving the use of a deadly weapon other
than a deadly weapon per se, the
State need show only that the weapon used was capable of causing serious bodily
injury or death in its use or intended use.” 
Id.  The court held that, with testimony that a BB
gun is capable of causing serious bodily injury, it is reasonable for a jury to
make a deadly weapon finding.  Id.  The
court also held that a jury may rationally infer that the BB gun used during a
convenience store robbery is loaded when a defendant threatens serious bodily
injury to the clerk and points the BB gun at her.  Id.
at 582.  

Here,
Geer testified that Appellant’s knife resembled a “utility kind of knife,” one
of the “newer ones that you pop open,”[22]  and he identified the demonstrative knife as resembling
Appellant’s knife.  Geer testified that
Appellant stuck the knife’s blade to his throat and that he felt a stinging and
that he saw blood.  The jury could have
reasonably considered that the knife’s blade was sharp enough to inflict injury
and that Appellant inflicted the wound in a vulnerable area.  See
Tucker, 274 S.W.3d at 692 (noting
that a stab wound to the back of the neck near the spine “would seem to carry
at least some potential for resulting in a serious bodily injury such as
paralysis or death”).  Lieutenant Rose
testified that a box cutter is a knife, that it is capable of causing death or
serious bodily injury, and that the demonstrative knife was “definitely”
capable of causing death or serious bodily injury.  Patrol Lieutenant Cromwell also testified
that “without a doubt” the demonstrative knife was capable of causing serious
bodily injury. Thus, the evidence was sufficient for the jury to conclude that
the knife Appellant used was capable of causing serious bodily injury or death
in its use or intended use.    

 Viewing the evidence in the light most
favorable to the verdict, we hold that the evidence is sufficient to support
the jury’s findings.  We overrule
Appellant’s first and second points.  

V.  Conclusion

          Having overruled each of Appellant’s
two points, we affirm the trial court’s judgments. 

 

ANNE GARDNER
JUSTICE

 

PANEL:  GARDNER, MCCOY, and
MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: December 30, 2010











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Penal Code Ann. §§ 22.01(a)(1), (2),
22.02(a)(2) (Vernon Supp. 2010).





[3]When the
prosecutor asked Geer whether it hurt when Appellant placed the knife to his
throat, Geer answered, “Yes and no.  I
think I was kind of in, you know just shock or surprised.  I could feel the sting but—.” 





[4]Amanda and
Appellant married shortly after the offense. 
At trial, Amanda invoked her privilege not to testify against her
husband.  See Tex. R. Evid. 504(b).  





[5]Geer was not
charged with an offense.  Lieutenant Johnny Rose testified that, as lead
investigator, he determined that Geer had acted within his lawful rights in
defending himself and his family.    





[6]Appellant and Geer’s
initial physical confrontation is most directly relevant to the charged
offenses; therefore, we focus primarily on testimony relevant to this aspect of
the incident.        





[7]Julian identified
photographs taken a few hours after the offense of his father’s neck wound and blood-stained
T-shirt and of the dried blood on his father’s bare chest.  





[8]On
cross-examination, Herring acknowledged that his written statement to the
police did not mention a knife, explaining that he was focused on the shooting
at that time.   





[9]On
cross-examination, Bobo testified that he did not remember whether his written
statement to the police mentioned a knife, and defense counsel suggested that
it did not. 





[10]In attempting to
introduce the demonstrative knife as an exhibit, the prosecutor asked Geer if
he believed it would aid the jury. 
Defense counsel objected that Geer’s opinion was irrelevant to the knife’s
admissibility.  The trial court sustained
the objection and did not allow the State to introduce the knife into
evidence.  





[11]Rachel Thompson
testified that she saw the entire incident from the passenger seat of her
vehicle.  Although she did not see a
knife during the altercations, Thompson testified that when Appellant was shot,
“it looked like he was holding onto something [in his right hand] as he fell to
the ground.”  She also testified that,
while Appellant was sitting on the ground, the woman sitting next to him, whom
she identified as Amanda, got up, got into her car, sped away, and came
back.    

In addition, Nancy Covey testified that, after hearing a gunshot outside
her home, she saw Appellant and Amanda (both of whom she knew) in her
driveway.  Once outside, Covey heard
Appellant order Amanda to leave. 
According to Covey, Amanda left and returned ten to fifteen minutes
later.  Covey also testified that, one
month before trial, she and others were at a neighborhood bar discussing the
type of knife used in this case, that Amanda was also at the bar within earshot
of the conversation, and that Amanda displayed a box blade that resembled the
State’s demonstrative knife.  





[12]In addition to
instructing the jury on counts one and two, the court instructed the jury on
the lesser-included offense of assault as to each count.  





[13]Although Appellant
does not concede that he used a knife during the assault, we do not construe
his arguments to include a challenge regarding the sufficiency of the evidence
to support this element of the offense.  While
Appellant asserts that the evidence is legally and factually insufficient to
establish that he used or exhibited a deadly weapon, he specifies that the
evidence is legally insufficient “[i]n particular” because “a rational trier of
fact must have had a reasonable doubt that [he] intended a use of a knife in a
manner which it would be capable of causing serious bodily injury or
death.”  Because we ultimately hold the
evidence sufficient to prove that Appellant’s knife constituted a deadly
weapon, we necessarily hold the evidence sufficient to prove that Appellant
used a knife while committing the assault. 





[14]443 U.S. 307, 319,
99 S. Ct. 2781, 2789 (1979).





[15]922 S.W.2d 126,
129 (1996), overruled by Brooks, 323
S.W.3d at 912. 





[16]The penal code
defines “deadly weapon” as:  (A) a
firearm or anything manifestly designed, made, or adapted for the purpose of
inflicting death or serious bodily injury; or (B) anything that in the manner
of its use or intended use is capable of causing death or bodily injury.  Tex. Penal Code Ann. § 1.07(a)(17) (Vernon
Supp. 2010). 





[17]Appellant
also quotes from McCain to support
his position, but as explained below, Appellant reads McCain too narrowly.  See 22 S.W.3d at 503.  





[18]In Thomas, the issue was whether a “shank”
was a deadly weapon within subsection (A) of the penal code’s deadly weapon
definition.  See 821 S.W.2d at 617.





[19]In conducting a
sufficiency review, we presume the undescribed demonstrations supported the
jury’s verdict.  See Rogers v. State, 756
S.W.2d 332, 336 (Tex. App.—Houston [14th Dist.] 1988 pet. ref’d) (citing Gaona v. State, 733 S.W.2d 611, 613–14
n.1 (Tex. App.—Corpus Christi 1987, pet. ref’d)); see also Morales v. State,
293 S.W.3d 901, 909 (Tex. App.—Texarkana 2009, pet. ref’d) (holding that, as an
appellate court, it was “constrained to defer to the jury’s findings, based on
its observation of the gestures and demonstrations at trial” which were “not
transcribed and which we cannot see”). 





[20]See Bailey v. State, No.
10-07-00381-CR, 2008 WL 5246683, at *4 (Tex. App.—Waco June 3, 2008, pet.
ref’d) (mem. op., not designated for publication) (viewing as an expression of intent to inflict harm, “‘You better get
out of here bitch ass n----’ or something like that”).





[21]See Tucker, 274 S.W.3d at 692 (noting common wisdom
that the throat is a particularly vulnerable part of the body (citing Morales, 633 S.W.2d at 868)). 





[22]Geer told EMT
Daugherty that Appellant struck him with “what appeared to be a box cutter.”