

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00357-CR

SHAWN KELLY VINCE VINSON            APPELLANT
A/K/A SHAWN KELLY VINSON
A/K/A SHAWN VINCE VINSON

V.

THE STATE OF TEXAS                           STATE

------------

## FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

------------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant Shawn Kelly Vince Vinson, a/k/a Shawn Kelly Vinson and Shawn Vince Vinson, appeals his two convictions for aggravated assault with a deadly

---

[1]*See* Tex. R. App. P. 47.4.

weapon.[2]   In two points, Appellant contends that the evidence is legally and factually insufficient to establish the aggravating element of the assaults—that he used or exhibited a deadly weapon.  We affirm.

## II. Factual Background

On September 4, 2008, Tracy Geer was driving his fourteen-year-old daughter Tara and his twelve-year-old son Julian home from school when Appellant suddenly backed his car out onto the roadway, causing Geer to slam on his brakes to avoid an accident.  As both cars moved forward, Geer began tailgating Appellant, who then slammed on his brakes.  As Geer attempted to pass, Appellant angled his car across the road and stopped.  When Geer attempted to back up, Appellant followed.  Finally, both men stopped, exited their cars, and exchanged words.  Geer testified that Appellant hopped out of his car and hollered, "You want some, Bitch?" and "Do you want some?"  As he approached Geer, Appellant "made sure" Geer saw him open what "looked like a utility kind of knife, that—the newer ones that you pop open."  In response, Geer threw up his hands and said, "Okay.  Dude.  I didn't know you was [sic] going to come out with a knife."  As Geer turned to walk back to his car, Appellant approached him from behind, grabbed him by the neck, and stuck the knife's blade to his throat.  As the knife was "sticking" into his throat, Geer felt a

---

[2]*See* Tex. Penal Code Ann. §§ 22.01(a)(1), (2), 22.02(a)(2) (Vernon Supp. 2010).

"stinging."[3]  In describing how he felt when he saw the knife, Geer testified, "Well, I guess you could say scared, yeah, scared for me and my kids."  He then explained that he was "scared maybe he—I would end up getting killed, cut, killed or whatever right in front of my kids."  Geer testified that he felt like there was an imminent threat to his person.  When Appellant finally released him, Geer got inside his car and saw "all the blood."

Geer felt trapped when he noticed Appellant hovering around the back of the car.  In an attempt to get Appellant to move his car and let them leave, Geer pulled out his nine millimeter pistol (for which he had a valid concealed handgun license) from the glove compartment and exited his car.  Upon seeing the gun, Appellant ran toward Geer, yelling, "You want some more, bitch?  What do you got there? What have you got there?"  As the two men stood within five feet of one another, Appellant "threw a punch" and "cold-cocked [Geer]," breaking his sunglasses in half and popping his head back.  Geer responded by shooting Appellant in the leg.  Appellant stepped back and sat down on the ground. Appellant's claimed common-law wife, Amanda, who had been riding with Appellant, hopped out of the car and went to Appellant's side.[4]

---

[3]When the prosecutor asked Geer whether it hurt when Appellant placed the knife to his throat, Geer answered, "Yes and no.  I think I was kind of in, you know just shock or surprised.  I could feel the sting but—."

[4]Amanda and Appellant married shortly after the offense.  At trial, Amanda invoked her privilege not to testify against her husband.  *See* Tex. R. Evid. 504(b).

3

As Geer paced back and forth, Appellant stated, "It's okay. You can go ahead and go. Just – just leave. I'll take care of this. Just go." Geer got into his car and drove approximately 100 yards, but then told his daughter to call 9-1-1 and returned to the scene. As he waited for the authorities, Geer heard Appellant say to a few people gathered around: "We got in an argument and he shot me." When Geer approached the group and stated, "because he brought out a knife and stuck me with it," Appellant responded, "What knife? There's no knife." After an emergency medical technician (EMT) cleaned Geer's wound, Geer went to the police station and gave a statement.[5]

Geer's children, Tara and Julian, witnessed much of the incident from inside the car—Julian sitting in the front passenger seat and Tara sitting in the back. They generally corroborated the events described by their father.[6] Tara testified that both men were making hand gestures and glaring at one another before getting out of their cars. As Appellant approached their car from behind, her father threw up his hands and said, "All right, buddy. I didn't think you had to pull out a knife." When her father turned around to walk back to their car, Appellant approached him from behind holding "something silver in his hand" that

---

[5]Geer was not charged with an offense. Lieutenant Johnny Rose testified that, as lead investigator, he determined that Geer had acted within his lawful rights in defending himself and his family.

[6]Appellant and Geer's initial physical confrontation is most directly relevant to the charged offenses; therefore, we focus primarily on testimony relevant to this aspect of the incident.

he "swung up." Tara testified that "when he put my dad in a headlock, I'm guessing he stabbed him." After a minute, Appellant released her father, who got into the car with blood all over his shirt. Tara could not see her father's wound. During cross-examination, Tara testified that she saw "a flash of silver," that she was "pretty sure it was a knife," and that she did not see the knife's size.

Julian testified that, when his father and Appellant exited their cars, they were making faces and hand gestures and were yelling at one another. Julian heard his father yell, "What the hell is your problem?" Julian testified that, as the two men approached one another, his father said, "Man, I didn't know you were going to pull out a knife." As his father turned and walked back to the car, Appellant grabbed him from behind and put his arm over his neck. From inside the car, Julian could see only the two men from their chests down and could not see Appellant's hands or whether he had a knife. After Appellant ordered Geer back inside the car, Julian saw a cut on his father's neck and blood all over his shirt.[7]

Several other individuals witnessed various aspects of the offense. Three young adults, Alston Herring, Ashley Watson, and Brandon Bobo, were riding in the car together when they saw two cars parked on the side of the road and two men arguing. They remained in their car parked approximately thirty yards away.

_____

[7]Julian identified photographs taken a few hours after the offense of his father's neck wound and blood-stained T-shirt and of the dried blood on his father's bare chest.

5

Herring testified that one individual approached the other carrying "what looked like a knife in his hand," although Herring was not "a hundred percent sure" it was a knife.[8] He saw the two men engage in a struggle and then separate. When defense counsel asked Herring if he was speculating that Appellant had a knife in his hand, Herring stated, "[F]rom what I saw with the man on the cut on his neck, obviously it was [a] knife, some kind of sharp object." Ashley Watson testified that she did not remember seeing a knife. Brandon Bobo testified that, as the two men (whom Bobo identified in court as Appellant and Geer) argued, Geer turned around toward his car. Appellant suddenly grabbed Geer from behind, and the two men scuffled. Bobo testified that "[t]here was definitely something in [Appellant's] hand. If – I don't know – there was definitely a blade. I don't know if it was a steak knife, pocket knife, what it was."[9]

EMT Samuel Daugherty testified that he was dispatched to the scene and that he cleaned Geer's wound and covered it with gauze. Daugherty's written report stated in part, "Patient states that he was assaulted by an individual and was struck in the head and neck with what appeared to be a box cutter." Daugherty's report also stated that Geer's neck laceration was one-half or .5

---

[8]On cross-examination, Herring acknowledged that his written statement to the police did not mention a knife, explaining that he was focused on the shooting at that time.

[9]On cross-examination, Bobo testified that he did not remember whether his written statement to the police mentioned a knife, and defense counsel suggested that it did not.

centimeters deep and about the size of a fingernail, and it described Geer's wound as a "minor laceration." When defense counsel asked Daugherty if Geer's laceration could have been caused by "anything," he replied, "Obviously some kind of trauma was sustained."

Several witnesses testified that the knife was never recovered from the crime scene. Geer identified a knife—displayed by the State for demonstrative purposes only—as similar to the knife used by Appellant.[10] Geer demonstrated Appellant's use of the knife as he approached. Lieutenant Johnny Rose testified that he was a fifteen-year veteran in the Hood County Sheriff's Department and that, in his opinion, a box cutter is a knife and is capable of causing death or serious bodily injury. When shown the State's demonstrative knife, Lieutenant Rose testified that it was "definitely" the type of knife that is capable of causing death or serious bodily injury. Patrol Lieutenant Jim Cromwell testified that he had thirty years of law enforcement experience and that he also participated in this investigation. Regarding the State's demonstrative knife, Cromwell testified that, "without a doubt," "that knife is capable of creating serious bodily injury."

---

[10]In attempting to introduce the demonstrative knife as an exhibit, the prosecutor asked Geer if he believed it would aid the jury. Defense counsel objected that Geer's opinion was irrelevant to the knife's admissibility. The trial court sustained the objection and did not allow the State to introduce the knife into evidence.

The State also presented evidence suggesting that Amanda removed Appellant's knife from the crime scene.[11]

Appellant did not testify. His primary defensive theory during the guilt phase of trial was that the two men engaged in mutual, hand-to-hand combat but that he never used or exhibited a knife.

### III. Procedural Background

Appellant pleaded not guilty to a two-count indictment charging him with (1) intentionally, knowingly, or recklessly causing bodily injury to Tracy Geer by cutting his neck and (2) intentionally or knowingly threatening imminent bodily injury to Tracy Geer. Both counts alleged that Appellant "use[d] or exhibit[ed] a deadly weapon during the commission of the assault, to wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury." As to each count, the jury found Appellant guilty of aggravated assault

---

[11]Rachel Thompson testified that she saw the entire incident from the passenger seat of her vehicle. Although she did not see a knife during the altercations, Thompson testified that when Appellant was shot, "it looked like he was holding onto something [in his right hand] as he fell to the ground." She also testified that, while Appellant was sitting on the ground, the woman sitting next to him, whom she identified as Amanda, got up, got into her car, sped away, and came back.

In addition, Nancy Covey testified that, after hearing a gunshot outside her home, she saw Appellant and Amanda (both of whom she knew) in her driveway. Once outside, Covey heard Appellant order Amanda to leave. According to Covey, Amanda left and returned ten to fifteen minutes later. Covey also testified that, one month before trial, she and others were at a neighborhood bar discussing the type of knife used in this case, that Amanda was also at the bar within earshot of the conversation, and that Amanda displayed a box blade that resembled the State's demonstrative knife.

with a deadly weapon as charged in the indictment.[12]   During the punishment phase, Appellant pleaded "true" to two enhancement paragraphs alleging prior sequential felony convictions for assault of a public servant and burglary of a building.   The jury assessed punishment at ninety-nine years' confinement for each count (to run concurrently), and the trial court sentenced Appellant accordingly.   The trial court's judgment in each case reflects an affirmative deadly weapon finding.

## IV. Sufficiency of the Evidence

In two points, Appellant contends that the evidence is legally and factually insufficient to support the jury's finding that the knife used or exhibited during the assault was a deadly weapon.[13]

---

[12]In addition to instructing the jury on counts one and two, the court instructed the jury on the lesser-included offense of assault as to each count.

[13]Although Appellant does not concede that he used a knife during the assault, we do not construe his arguments to include a challenge regarding the sufficiency of the evidence to support this element of the offense.   While Appellant asserts that the evidence is legally and factually insufficient to establish that he used or exhibited a deadly weapon, he specifies that the evidence is legally insufficient "[i]n particular" because "a rational trier of fact must have had a reasonable doubt that [he] intended a use of a knife in a manner which it would be capable of causing serious bodily injury or death."   Because we ultimately hold the evidence sufficient to prove that Appellant's knife constituted a deadly weapon, we necessarily hold the evidence sufficient to prove that Appellant used a knife while committing the assault.

## A. Standard of Review

The court of criminal appeals recently held that there is "no meaningful distinction" between a legal-sufficiency standard under *Jackson v. Virginia*[14] and a factual-sufficiency standard under *Clewis v. State*.[15] *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). "[T]he *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary, including *Clewis*, are overruled." *Id.* Accordingly, we will conduct a single review of Appellant's sufficiency complaints under the *Jackson* standard, which asks whether, in considering all the evidence in the light most favorable to the verdict, the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Jackson*, 443 U.S. at 391, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

## B. Discussion

A weapon can be deadly by design or use.[16] *See* Tex. Penal Code Ann. § 1.07(a)(17)(A), (B). An ordinary knife is not a deadly weapon per se; that is, it is

---

[14]443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).

[15]922 S.W.2d 126, 129 (1996), overruled by *Brooks*, 323 S.W.3d at 912.

[16]The penal code defines "deadly weapon" as: (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use

10

not an object manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury. *Id.* § 1.07(a)(17)(A); *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2009) (citing *McCain v. State*, 22 S.W.3d 497, 502–03 (Tex. Crim. App. 2000)). Instead, a knife becomes a deadly weapon if, in the manner of its use or intended use, it is capable of causing death or serious bodily injury. Tex. Penal Code Ann. § 1.07(a)(17)(B); *McCain*, 22 S.W.3d at 503. The State's indictment and the court's jury instructions tracked this statutory language, and the State bore the burden of proving that Appellant "use[d] or exhibit[ed] a deadly weapon during the commission of the assault, to wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury."

Citing *Thomas v. State*, Appellant initially contends that the State bore the burden of proving that he used, or intended to use, the knife in a manner that would cause death or serious bodily injury.[17]  *See* 821 S.W.2d 616, 620 (Tex. Crim. App. 1991) (stating in part that "utility knives . . . do not qualify as deadly weapons unless actually used or intended to be used in such a way as to cause death or serious bodily injury"). Appellant asserts that a rational trier of fact would have had a reasonable doubt about this "manner of use" prong because

---

is capable of causing death or bodily injury. Tex. Penal Code Ann. § 1.07(a)(17) (Vernon Supp. 2010).

[17]Appellant also quotes from *McCain* to support his position, but as explained below, Appellant reads *McCain* too narrowly. *See* 22 S.W.3d at 503.

11

the evidence demonstrates that he was merely "trying to run off Geer, not kill him." Appellant emphasizes that (1) he never threatened to kill Geer; (2) any exhibition or use of a knife was for a "short duration"; (3) Geer suffered only a minor wound; and (4) Geer escaped from—or was released by—Appellant and got back into his car.

Appellant's reliance on *Thomas* is misplaced. The court of criminal appeals has held that the State is not required to prove specific intent to use the object as a deadly weapon:

> The provision's plain language does not require that the actor actually intend death or serious bodily injury; an object is a deadly weapon if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury. The placement of the word "capable" in the provision enables the statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force.

*McCain*, 22 S.W.3d at 503 (citing *Tisdale v. State*, 686 S.W.2d 110, 114–15 (Tex. Crim. App. 1984)); *see Bailey v. State*, 38 S.W.3d 157, 158–59 (Tex. Crim. App. 2001) (quoting *McCain*). Notably, the *McCain* court also explained that the language in its earlier *Thomas* opinion—stating that certain objects are not deadly weapons "unless actually used or intended to be used in such a way as to cause death or serious bodily injury"—was "somewhat misleading" in that it made a "short-hand reference to subsection (B)'s requirement while the Court focused

12

upon the applicability of subsection (A)."[18] *McCain*, 22 S.W.3d at 503. The court noted that "[a] subsequent paragraph in the opinion rectifies this omission by including the word 'capable' in its discussion." *Id.* Thus, we rely on the above-quoted language in *McCain* in analyzing Appellant's claim.

Here, Geer testified that Appellant hopped out of his car, displayed an open utility knife, and stated angrily, "Do you want some, Bitch. Do you want some?" Appellant then wrapped his arm around Geer's neck, stuck the point of a blade to his throat, and cut him. Geer testified that he was scared Appellant would kill him or "cut him up" in front of his kids and that he felt an imminent threat to his person. Additionally, Geer reenacted how Appellant approached him with the knife. When the prosecutor demonstrated how the knife opened, Geer agreed that Appellant opened his knife that way.[19] Based on the evidence, the jury could have reasonably construed Appellant's words as threatening harm

---

[18]In *Thomas*, the issue was whether a "shank" was a deadly weapon within subsection (A) of the penal code's deadly weapon definition. *See* 821 S.W.2d at 617.

[19]In conducting a sufficiency review, we presume the undescribed demonstrations supported the jury's verdict. *See Rogers v. State*, 756 S.W.2d 332, 336 (Tex. App.—Houston [14th Dist.] 1988 pet. ref'd) (citing *Gaona v. State*, 733 S.W.2d 611, 613–14 n.1 (Tex. App.—Corpus Christi 1987, pet. ref'd)); *see also Morales v. State*, 293 S.W.3d 901, 909 (Tex. App.—Texarkana 2009, pet. ref'd) (holding that, as an appellate court, it was "constrained to defer to the jury's findings, based on its observation of the gestures and demonstrations at trial" which were "not transcribed and which we cannot see").

or injury[20] and his conduct as assertive and aggressive. The jury also could have reasonably considered that Appellant cut Geer in a particularly vulnerable part of the body.[21] Thus, the evidence was sufficient for the jury to conclude that Appellant intended a use of the knife in which it would be capable of causing death or serious bodily injury. *See id.* at 503. *Cf. Stewart v. State*, 198 S.W.3d 60, 63–64 (Tex. App.—Fort Worth 2006, no pet.) (holding that knife taken by defendant from the victim's residence during the burglary was capable of causing serious bodily injury or death but that there was no evidence that, in the manner of its use or intended use, it was capable of causing such injury where defendant never threatened, tried to stab, cut, or otherwise hurt victim with the knife).

Appellant additionally asserts that a rational juror could not have concluded that the knife was capable of causing serious bodily injury because there is no evidence that it was functioning. In support of his position, Appellant cites *Mosley v. State*, 545 S.W.2d 144, 145–46 (Tex. Crim. App. 1976). The *Mosley* court held that, in an assault-by-threat prosecution, an unloaded BB gun was not a deadly weapon where the testimony showed that the gun's pellets would not penetrate the skin; that it was never pointed at the victim's face; and that the

---

[20] *See Bailey v. State*, No. 10-07-00381-CR, 2008 WL 5246683, at *4 (Tex. App.—Waco June 3, 2008, pet. ref'd) (mem. op., not designated for publication) (viewing as an expression of intent to inflict harm, "'You better get out of here bitch ass n----' or something like that").

[21] *See Tucker*, 274 S.W.3d at 692 (noting common wisdom that the throat is a particularly vulnerable part of the body (citing *Morales*, 633 S.W.2d at 868)).

14

defendant never used the gun or threatened to use it as a bludgeon. *Id.* Appellant emphasizes that, in his case (1) the knife was never recovered (and therefore no one examined it); (2) the demonstrative knife was insufficient to establish, and should not be used to determine, whether the actual knife functioned either fully or partially and how far the blade was capable of protruding; and (3) Geer failed to testify to the size, length, or sharpness of the blade of either the actual or the demonstrative knife.

The State need not introduce the weapon into evidence when the victim describes the weapon and the manner in which it was used. *Billey v. State*, 895 S.W.2d 417, 420 (Tex. App.—Amarillo 1995, pet. ref'd) (citing *Morales v. State*, 633 S.W.2d 866, 868 (Tex. Crim. App. 1982)); *see Magana v. State*, 230 S.W.3d 411, 414 (Tex. App.—San Antonio 2007, pet. ref'd). Further, Texas caselaw permits counsel to use jury aids that are not admitted into evidence to assist the jury in understanding the evidence actually introduced. *Garner v. State*, 939 S.W.2d 802, 807 (Tex. App.—Fort Worth 1997, pet. ref'd); *see Runnels v. State*, 193 S.W.3d 105, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (Keyes, J., concurring); *Buie v. State*, No. 14-95-00620-CR, 1998 WL 507750, at *11 (Tex. App.—Houston [14th Dist.] Aug. 20, 1998, no pet.) (not designated for publication) (citing *Garner*). Jurors are entitled to use their common knowledge and experience to make connections in terminology, and they are free to use their common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may be reasonably drawn

15

from the evidence. *Wawrykow v. State*, 866 S.W.2d 87, 88–89 (Tex. App.—Beaumont 1993, pet. ref'd) (citing *United States v. Heath*, 970 F.2d 1397, 1402 (5th Cir. 1992)); *see Moore v. State*, No. 03-98-00584-CR, 1999 WL 816743, at *2 (Tex. App.—Austin Oct. 14, 1999, no pet.) (not designated for publication) (noting that juries can use common knowledge and experience to determine that a box cutter is also known as a utility knife). Consequently, Appellant's complaints regarding the unavailability of the actual knife, the State's use of a demonstrative knife, and Geer's description of the knife's blade are without merit.

Further, the *Mosley* case cited by Appellant is inapposite. Unlike the affirmative evidence in *Mosley* that the BB gun was not capable of causing death or serious bodily injury, there was evidence in Appellant's case from which a jury could have rationally inferred that Appellant's knife was capable of causing death or serious bodily injury. *See Adame v. State*, 69 S.W.3d 581 (Tex. Crim. App. 2002). In *Adame*, the defendant entered a convenience store with a BB gun; the store clerk feared for her life when he pointed the gun at her and demanded all the money; and a police investigator testified that the defendant's BB gun "could cause serious bodily injury if it were pointed and fired at someone." *Id.* at 581. The intermediate appellate court held that the evidence was insufficient to support the jury's deadly weapon finding because the State did not present evidence that the BB gun was loaded. *Id.* The court of criminal appeals concluded, however, that whether the gun was loaded was not significant to the analysis. *Id.* at 582. "What is significant is that appellant's BB gun was capable

16

of causing serious bodily injury." *Id.* (citing *McCain*, 22 S.W.3d at 503 and comparing *Mosley*, 545 S.W.2d at 145–46). The court stated that it is not necessary to place an additional evidentiary burden on the State to affirmatively prove that a BB gun was loaded at the time of the commission of the offense. *Id.* "[I]n proving the use of a deadly weapon other than a deadly weapon *per se*, the State need show only that the weapon used was capable of causing serious bodily injury or death in its use or intended use." *Id.* The court held that, with testimony that a BB gun is capable of causing serious bodily injury, it is reasonable for a jury to make a deadly weapon finding. *Id.* The court also held that a jury may rationally infer that the BB gun used during a convenience store robbery is loaded when a defendant threatens serious bodily injury to the clerk and points the BB gun at her. *Id.* at 582.

Here, Geer testified that Appellant's knife resembled a "utility kind of knife," one of the "newer ones that you pop open,"[22] and he identified the demonstrative knife as resembling Appellant's knife. Geer testified that Appellant stuck the knife's blade to his throat and that he felt a stinging and that he saw blood. The jury could have reasonably considered that the knife's blade was sharp enough to inflict injury and that Appellant inflicted the wound in a vulnerable area. *See Tucker*, 274 S.W.3d at 692 (noting that a stab wound to the back of the neck near the spine "would seem to carry at least some potential for resulting in a

_____

[22]Geer told EMT Daugherty that Appellant struck him with "what appeared to be a box cutter."

serious bodily injury such as paralysis or death"). Lieutenant Rose testified that a box cutter is a knife, that it is capable of causing death or serious bodily injury, and that the demonstrative knife was "definitely" capable of causing death or serious bodily injury. Patrol Lieutenant Cromwell also testified that "without a doubt" the demonstrative knife was capable of causing serious bodily injury. Thus, the evidence was sufficient for the jury to conclude that the knife Appellant used was capable of causing serious bodily injury or death in its use or intended use.

Viewing the evidence in the light most favorable to the verdict, we hold that the evidence is sufficient to support the jury's findings. We overrule Appellant's first and second points.

## V. Conclusion

Having overruled each of Appellant's two points, we affirm the trial court's judgments.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: December 30, 2010