

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00131-CR

**JOEL W. ANDERSON,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 249th District Court
Johnson County, Texas
Trial Court No. F44524**

## MEMORANDUM OPINION

In two different cause numbers that were tried together, appellant, Joel W. Anderson, was charged by indictment with one count of murder and one count of aggravated assault against a potential witness. *See* TEX. PENAL CODE ANN. §§ 19.04(a), 22.02(a), (b)(2)(C) (West 2011). After a jury trial, Anderson was convicted of the lesser-included offense of manslaughter in the murder case and was acquitted in the aggravated-assault case. In convicting Anderson of manslaughter, a second-degree felony, the jury concluded that Anderson had used a deadly weapon in committing the

offense. *See id.* § 19.04(b). The jury subsequently sentenced Anderson to twenty years' incarceration in the Institutional Division of the Texas Department of Criminal Justice with a $10,000 fine. In one issue on appeal, Anderson argues that the evidence is legally insufficient to support the jury's finding that he "recklessly" caused the death of his roommate, Rodolfo Sanchez. We affirm.

## I. BACKGROUND

On the evening of January 31, 2010, Anderson, Sanchez, and Gerald Ballio gathered in Anderson's garage to watch the NFL Pro Bowl game. By all accounts, Anderson, Sanchez, and Ballio were good friends who regularly gathered to barbecue and drink beer. On this evening, the friends were drinking beer and watching the game. At some point, Anderson and Sanchez decided to shoot targets and each other with Airsoft guns. At trial, the Airsoft guns were described as toy guns that shot round, plastic pellets or BBs. One target, a small bolt standing upright on an industrial-size toolbox, proved difficult to topple with the BBs from the Airsoft guns. According to Ballio, Anderson responded in a joking manner that he knew what would knock over the target. Anderson left the garage and went to his bedroom to retrieve two handguns. Anderson returned with a single-action .22-caliber revolver and a .45-caliber semiautomatic pistol. Anderson testified that his purpose for bringing the guns to the garage was to clean them, though he later admitted that he did not clean either of the guns. Anderson placed both of the guns on a table in the garage, and the friends finished watching the game and the following program—ESPN Sports Center.

When Sports Center ended at around 11:00 p.m., Anderson allegedly got up and went over to a toolbox near the stool where Sanchez was sitting. Ballio stated that Sanchez was bent over picking up BBs from the garage floor. A short time later, Ballio observed Anderson holding the .22-caliber revolver in his right hand and that the revolver was in a cocked position. Ballio noted that Anderson deliberately pressed the revolver against Sanchez's head, just behind his left ear, and pulled the trigger. Sanchez then fell to the floor and began to bleed profusely, at which point Ballio recalled Anderson saying, "Get the hell out of here now, Ballio," while pointing the revolver in Ballio's direction. Stunned by what had just happened and in fear of his life, Ballio opened the garage door and fled to his house across the street. Once Ballio was gone, Anderson called 911 to report that he and Sanchez had been playing with guns and that Sanchez had been shot.

Alvarado Police Department officers responded to Anderson's call minutes later. When officers arrived at Anderson's house, they discovered that the garage door was shut and that no lights were on inside the house. Officers walked up to the front door and knocked loudly. Minutes later, the garage door opened and Anderson came outside. According to officers, Anderson was intoxicated, though he appeared to have reasonable control of his faculties.[1] Anderson also appeared to be distraught and crying. One of the officers entered the garage to assess the situation while another officer remained outside with Anderson. Anderson told the officer the following: "me

---

[1] At the crime scene, Anderson was administered a portable-breath-alcohol test that resulted in a reading of 0.162.

and him [Sanchez] were in the garage drinking and playing with [A]irsoft pistols. . . . I picked up the [.]22[-]caliber pistol and aimed it at [Sanchez]. . . . I thought the gun was unloaded. . . . The gun went off."[2]

Sanchez was later transported to John Peter Smith Hospital in Fort Worth, Texas, where he died approximately twenty-five hours later. After Sanchez was transported to the hospital, detectives arrived at the scene and requested that Anderson do a "walk-through" to explain what had happened. Anderson agreed to do so and, according to Detective Scott Heisey, explained that:

> He [Anderson] relates that the two gentlemen were sitting and shooting the [A]irsoft guns that were previously noted at each other, at objects in the room. And he wasn't able to hit something, to some effect, he said "I can go find something that I can shoot that with." He went inside, retrieved a [.]22 that was from his bedroom, and came back out. And Mr. Anderson states that Mr. Sanchez pulled his wrist to his head and said something along the lines of, "put me out of my misery," and the gun just went off.[3]

---

[2] Anderson testified that he cleans his guns frequently and that the .22-caliber revolver had last been used by Sanchez on New Years' Day 2010. Anderson admitted that he is knowledgeable about guns and is a gun enthusiast. Police found numerous rifles and handguns inside the house that he shared with Sanchez. When examining the other firearms located in the house, police noticed that none of the firearms were loaded. Police also observed an opened box of ammunition used for the .22-caliber revolver in the garage. In addition, the State called a firearms expert, Jamie Becker, to testify that the .22-caliber revolver was a deadly weapon; that the gunpowder residue that was found inside of Sanchez's wounds demonstrated that the revolver was fired at close range in Sanchez's direction; that Sanchez did not have any detectable gunpowder residue on his hands; and that the only way the revolver could have fired is if it was loaded, the safety was off, the hammer was cocked, and Anderson had pulled the trigger. Becker denied that the revolver would have spontaneously fired, as suggested by Anderson.

[3] The record reflected that Sanchez was estranged from his girlfriend, Redonna Grissom. On the morning of the incident, Grissom and Sanchez got into an argument about taxes on a house that the two had once shared. Grissom testified that the argument got heated but that Sanchez called later in the day to apologize and to make up. In his own defense, Anderson described Sanchez as being in low spirits that evening as a result of the fight with Grissom and used this to support his assertion that Sanchez shot himself.

Anderson was then taken to the Alvarado Police Station in a police car. However, while he was detained in the police car, Anderson said, "He [Sanchez] called me a bitch. Fuck him!," which was captured by the car's audio recording device. Anderson was eventually released from custody after his hand was swabbed for gun-residue analysis, which ultimately yielded a negative finding, and other evidence was collected.

While the police were at Anderson's house, Ballio allegedly called Anderson's father, Virgil, to drive from Italy, Texas, to assist his son. Virgil, who had been convicted of several prior felonies, testified that Ballio told him to come to Anderson's house because Sanchez had shot himself and that Anderson was detained in a police car. Virgil testified that when he arrived, he saw Ballio on the sidewalk and went over to speak with him. According to Virgil, a police officer accompanied him while he walked towards Ballio. Virgil recalled Ballio telling the police officer that he did not know anything about the incident and denying that he was in the garage when the shooting transpired. Ballio then invited Virgil inside and told him that Sanchez had shot himself. Ballio disputed Virgil's recollection of the incident. Ballio testified that Virgil and Anderson's brother, Wade, harassed him repeatedly to tell police that Sanchez had shot himself and that he avoided the police initially because he was fearful for his life as a result of Anderson pointing the gun at him and because of Virgil and Wade's alleged harassment.[4] Nevertheless, Ballio went to the Alvarado Police Station

---

[4] Wade also testified at trial, and his testimony contradicted Ballio's. Wade noted that Ballio repeatedly called to tell him what had happened. According to Wade, each time he spoke to Ballio, the story changed and, at one point in time, Ballio allegedly told Wade that Anderson's life was in his hands. Wade also recounted that Ballio started acting weird and paranoid after the incident transpired.

four days later to tell police that Anderson had intentionally shot Sanchez. After hearing Ballio's story, police issued an arrest warrant for Anderson.

Anderson was later indicted, in separate cause numbers, for murder and aggravated assault against a potential witness, which corresponded to Ballio's assertion that Anderson pointed the gun at him and told him to "[g]et the hell out of here now . . . ." The two causes were consolidated in a single trial. After hearing the evidence, the jury convicted Anderson of the lesser-included offense of manslaughter, acquitted him of the aggravated-assault-against-a-potential-witness charge, found on a special issue that he had used a deadly weapon in the commission of the manslaughter, and sentenced him to twenty years' confinement with a $10,000 fine.[5] The trial court certified Anderson's right to appeal, and this appeal ensued.

## II. EVIDENTIARY SUFFICIENCY

In his sole issue on appeal, Anderson contends that the evidence is legally insufficient to support his conviction for manslaughter. In particular, Anderson asserts that "[t]he evidence at trial demonstrates that the victim . . . died as a result of his own actions in grabbing a gun held by appellant. At worst, Appellant was criminally negligent."

### A. Standard of Review

The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

---

[5] Among the evidence presented were numerous witnesses who testified that Anderson was a peaceful, law-abiding citizen.

In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, No. AP-76,020, ___ S.W.3d ___, ___, 2011 Tex. Crim. App. LEXIS 1222, at **43-44 (Tex. Crim. App. Sept. 14, 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2792-93. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

The sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically-correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

## B. Applicable Law

As indicted in this case, a person commits manslaughter "if he recklessly causes the death of an individual." TEX. PENAL CODE ANN. § 19.04(a).

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(c) (West 2011).

On the other hand, criminally negligent homicide occurs when a person causes the death of an individual by criminal negligence. *See* TEX. PENAL CODE ANN. § 19.05(a) (West 2011).

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross

deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d). Essentially, the difference between manslaughter and criminally negligent homicide is the culpable mental state required for each offense: recklessness for the former and criminal negligence for the latter. *See Thomas v. State*, 699 S.W.2d 845, 849 (Tex. Crim. App. 1985); *Nash v. State*, 664 S.W.2d 343, 344 (Tex. Crim. App. 1984). In other words, as described by the court of criminal appeals, reckless conduct involves:

> conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk . . . . Criminal negligence . . . involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.

*Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975).

## C. Discussion

On appeal, Anderson argues that, because he was not convicted of murder or aggravated assault of a potential witness, the jury clearly did not believe Ballio's testimony and, thus, all of Ballio's testimony should be disregarded. We disagree. As noted above, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers*, 805 S.W.2d at 461. In convicting Anderson of manslaughter but acquitting him of aggravated assault of a potential witness, it is not clear that the jury disbelieved all of Ballio's testimony; it is arguable that the jury disbelieved only a

portion of Ballio's testimony. Nevertheless, there is sufficient evidence to support Anderson's conviction, even without Ballio's testimony.

Anderson, a gun enthusiast and owner of many guns, admitted that he and Sanchez were firing Airsoft guns at each other on the night of the incident and that he went inside the house to retrieve two handguns when they were unable to topple a bolt on a table. Among the handguns retrieved was a .22-caliber revolver that was used in the shooting. Anderson also told police in his initial statement that he aimed the revolver at Sanchez. *See Thomas*, 699 S.W.2d at 850 ("[A] defendant who is familiar with guns, who knows a gun is loaded, and who points it at another person, is consciously disregarding a risk that his conduct—pointing a loaded weapon at another—may cause harm or death and is at least reckless.") (citing *Simpkins v. State*, 590 S.W.2d 129, 134 (Tex. Crim. App. 1979)); *Gaona v. State*, 733 S.W.2d 611, 615-17 (Tex. App.—Corpus Christi 1987, pet. ref'd) (holding that the evidence is legally sufficient to prove manslaughter based on testimony that Gaona, who was familiar with rifles and frequently hunted with rifles, aimed a rifle he knew was loaded in the general direction of the victim and pulled the trigger while the gun was pointed to the ground to scare the victim); *Rodriguez v. State*, 699 S.W.2d 358, 359 (Tex. App.—Dallas 1985, no pet.) (affirming a manslaughter conviction where the evidence established that appellant pointed a loaded gun at the victim and fired two shots in the general direction of the victim); *see also Fuller v. State*, No. 01-06-01077-CR, 2008 Tex. App. LEXIS 7330, at **7-8 (Tex. App.—Houston [1st Dist.] Oct. 2, 2008, no pet.) (mem. op., not designated for publication) (concluding that a rational jury could have found appellant guilty of

manslaughter because appellant, who was familiar with guns, pointed a gun he knew was loaded at the complainant and fired the gun). He later changed his story to suggest that Sanchez grabbed his forearm so that the gun would be aimed at Sanchez's head. Anderson also explained that he brought the guns to the garage to clean them, not to shoot them at targets. However, he acknowledged later in his testimony that he never attempted to clean the guns that night.

Lloyd White, M.D., the deputy medical examiner for the Tarrant County Medical Examiner's Office, noted that he performed an autopsy on Sanchez and determined that the contact-entrance wound was slightly below and behind Sanchez's left ear, which would seem to refute Anderson's story that Sanchez grabbed Anderson's forearm to point the gun at himself. Dr. White also testified that the general trajectory of the bullet was forward and downward, which suggested that Anderson was standing over and behind Sanchez when the shot was fired. Becker, the State's firearms expert witness, testified that the gunpowder residue found in Sanchez's gunshot wounds indicated that the gun was fired at a close range in Sanchez's direction and that the revolver could only be fired if it was loaded; the safety was off; the hammer was cocked; and the trigger was pulled—all of which could be characterized as deliberate actions. Moreover, police discovered an open box of ammunition that was used for the revolver, and Anderson testified that he did not keep loaded weapons in the house. Both of these facts support an inference that Anderson loaded the handgun when he brought it out to

the garage that night.[6]  Furthermore, Anderson's statement in the police car, "He [Sanchez] called me a bitch.  Fuck him!," appears to suggest a motive in this case.  Also, despite Wade's statement that Ballio indicated that Anderson's life was in his hands, most of the evidence proffered by the State corroborates Ballio's testimony about what had transpired that night.  In convicting Anderson of manslaughter, it is apparent that the jury did not believe the stories of Anderson and his family and friends that the shooting was simply an accident for which he should be acquitted.  *See Chambers*, 805 S.W.2d at 461.  And to the extent that the testimony of Anderson and his friends contradicts the State's evidence, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2792-93.

Therefore, based on the record before us, we conclude that the jury was rational in concluding that Anderson, at the very least, recklessly caused the death of Sanchez.  *See Jackson*, 443 U.S. at 318-19, 99 S. Ct. 2788-90; *Hooper*, 214 S.W.3d at 13; *see also* TEX. PENAL CODE ANN. § 19.04(a).  We do not agree that Anderson's actions amounted solely to criminally negligent homicide because he intentionally brought the revolver to shoot targets in the garage; he admitted to pointing the gun at Sanchez; an opened box of .22-caliber ammunition was found in the garage; and the evidence demonstrated that Sanchez was shot from behind—all acts that the jury rationally concluded were a

---

[6] To the extent that Anderson alleges that it was Sanchez's fault that the revolver was loaded, the fact that Anderson took a .22-caliber revolver to shoot targets in the garage and failed to check to see if it was loaded before aiming it at Sanchez would appear to be reckless or a gross deviation from the general standard of care that an ordinary person would exercise regarding the handling of firearms as viewed from the actor's standpoint.  *See* TEX. PENAL CODE ANN. § 6.03(c) (West 2011).

conscious disregard of a substantial and unjustifiable risk, not a failure on Anderson's part to perceive that the gun might fire when he pointed it at Sanchez. *See Thomas*, 699 S.W.2d at 849; *Nash*, 664 S.W.2d at 344; *Lewis*, 529 S.W.2d at 553. Accordingly, we hold that the evidence is legally sufficient to support Anderson's conviction. *See Jackson*, 443 U.S. at 318-19, 99 S. Ct. at 2788-90; *Hooper*, 214 S.W.3d at 13. Anderson's sole issue on appeal is overruled.

## III. CONCLUSION

We affirm the judgment of the trial court.


AL SCOGGINS
Justice


Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed February 1, 2012
[CR25]